[No. 387. Decided December 18, 1891.]

HERMAN CHAPIN v. ELISHA P. FERRY, *Governor*, THOMAS
M. REED, *Auditor*, AND R. G. C'BRIEN, *Adjutant
General of the State of Washington.*

STATE MILITIA — POWERS OF GOVERNOR — RIOTS — MILITIA IMPROPERLY
CALLED OUT—RIGHT TO PAY.

Sec. 860, Code 1881, providing that any sheriff, deputy sheriff, etc.,
in case of a riot, may call out an "armed force," if necessary, to arrest
and secure in custody all persons engaged therein, does not authorize
such peace officers to command the services of the state militia.

Where the colonel of a regiment of the state militia is ordered by
the governor to call out one or more companies to render aid to the
civil authorities in the suppression of a riot, if called upon by the
sheriff, such companies do not become a part of the sheriff's *posse
comitatus*, but are engaged in the service of the state, in the preserva-
tion of its peace and the execution of its laws.

Under the terms of art. 10, § 2, of the constitution, vesting in the
governor the power to call forth the militia to execute the laws of the
state, the governor is not bound in any case where, in his judgment,
the danger of riot and bloodshed is imminent, to observe the antecedent
formalities required by Laws 1889-90, p. 627, § 1, subd. 12, before call-
ing forth the military power of the state.

Where the militia has been called into the service of the state, they
are entitled to pay, whether there was reasonable ground for calling
them out or whether the call was formally correct, or not.

The act of February 25, 1890, relating to the duties of the governor,
is controlled by the later enactment of March 27, 1890, prescribing the
powers of the governor in regard to the militia force of the state, if
there is any conflict between the two enactments.

*Original Application for Mandamus.*

J. C. *Haines*, and J. M. *Ashton*, for petitioner.

W. C. *Jones*, Attorney General, for respondents.

The opinion of the court was delivered by

STILES, J.—The respondents constitute the board of
military auditors under the militia law of 1890, § 23 (Laws

1889–90, p. 508). The petitioner is the paymaster of the first regiment, national guard of Washington, and as such prays that a writ of mandamus be issued directing the military board of auditors to audit the claims of certain officers and enlisted men of his regiment for pay, while in the service of the state, as he contends they were, under the following circumstances: The first regiment, of which J. C. Haines was colonel, was constituted, at the times mentioned in the affidavit, of nine companies, designated as companies B, C, D, E, F, G, H, I and K, of which companies C and G were stationed at Tacoma, in Pierce county; companies B, D and E at Seattle, King county, and company I at Port Townsend, Jefferson county; all of the members of these companies being residents of the counties in which they were stationed, and a majority of them being voters in these counties. On the 24th day of June, 1891, there was a large body of armed men riotously assembled at Gilman, in King county, and threatening to destroy the buildings and machinery connected with the operation of a large and valuable coal mine there. The sheriff of the county being absent, the manager of the mine applied to the deputy sheriff for a sufficient force to protect it from injury and destruction, but the deputy declined to act in the absence of the sheriff. The manager requested the colonel of the regiment to order out troops from his regiment for that purpose. This he refused to do. The manager then inquired whether, if the sheriff should call upon him for the troops to act as a *posse comitatus*, he would furnish them. The colonel declined to act without orders from the governor, but at the request of the manager of the mine sent to the governor the following telegram:

"SEATTLE, June 24, 1891.
" *Governor E. P. Ferry, Olympia Hotel:*

"I am informed that a riot has occurred at Gilman, and the destruction of mine property is threatened now by

armed men. The sheriff is at Walla Walla. His deputy here declines to act for want of authority. The owners of the mine have appealed to me for protection. I have refused until properly ordered. If the sheriff requests me to send troops to use as a *posse*, can I do it without orders from you? See § 860 of the code, and *Ela v. Smith*, 5 Gray, 121. I am informed the situation is critical, and that loss of life and property are likely unless prompt action is taken.          COLONEL J. C. HAINES."

And received in reply the following:

"OLYMPIA, June 25, 1891.

"*Colonel J. C. Haines, Commanding First Regiment N. G. W., Seattle:*

"If any officer mentioned in § 860 of the Code of Washington calls for an armed force to suppress a riot, or to enforce the execution of the laws at Gilman, in King county, you will immediately repair to that place with one or more companies of the N. G. W., as you may deem advisable, and render such aid to the civil authorities as may be necessary.          ELISHA P. FERRY, *Governor.*"

On the evening of Sunday, the 27th day of June, a riot occurred at the town of Franklin, in King county, which resulted in a battle between two contending factions, numbering in all about eight hundred men, and in which two men were killed and several wounded. The deputy at that point was unable to quell the riot or disperse the mob, and the conflict ceased only on account of the approach of darkness; the factions withdrew a short distance from each other, evidently intending to resume the battle with the coming of daylight on the following day. The deputy sheriff telegraphed Colonel Haines at Seattle requesting him to order immediately to Franklin one or more companies of his regiment to assist the civil authorities in preserving the peace. This telegram was received by the colonel at about half-past ten in the evening of that day. The members of his command were scattered throughout the city, but were collected and sent to Franklin, which is

thirty-four miles away, before daybreak. Prompt action seemed necessary, and the colonel immediately sent to the governor the following telegram:

"SEATTLE, WASH., June 27, 1891.

" *Elisha P. Ferry:*

"I have received a request from the deputy sheriff to send a company of the national guard to Franklin immediately, he expecting a riot at any moment. Several persons have been shot. I have ordered a company there, and will accompany them. I have no specified orders from you except for Gilman. If my action is not approved, wire me at Franklin.                    J. C. HAINES."

Companies B and D were ordered out, and as soon as a sufficient number of these companies were assembled to constitute one company available for duty the colonel proceeded with them at once to Franklin. arriving there at daybreak. To the telegram of June 27th no answer was sent by the governor. The arrival and presence of the troops at Franklin prevented any further outbreak at that point, and these companies remained in service until relieved from duty on the 15th day of July. On the 29th day of June the threatened riot at Gilman occurred, and the sheriff, after endeavoring in vain to quell it, requested the colonel to send two companies of his regiment to that place for the purpose of assisting the civil authorities in preserving the peace, and preventing the destruction of life and property. This he immediately did, sending companies D and E of his regiment there. They arrived at Gilman on the morning of the 30th of June and reported to the sheriff's deputy, and remained on duty until the 16th day of July, preventing by their presence any further riotous demonstrations.

At the towns of Franklin, Newcastle, Black Diamond and Gilman, in King county, there are large and valuable coal mines, the operation of which constitutes one of the principal industries of the state; and at those places unlawfully armed bodies of men, organized in the form of military

companies, paraded and drilled with arms in their posses-
sion, and threatened the property pertaining to the mines,
and the lives of those who labored in them, being a con-
stant menace to the public peace, and causing great terror
and alarm among the peaceable citizens of those towns.
In this state of affairs the governor, on the 2d day of July,
1891, addressed to Colonel Haines the following telegram:

"Olympia, July 2, 1891.

" *Colonel J. C. Haines, Franklin:*

"The civil authorities should disarm all unauthorized
armed bodies at Franklin, Gilman and elsewhere in King
county where there is danger of a riot or breach of the
peace. You will render all necessary assistance to the
civil authorities in this direction. After disarmament,
the sheriff and deputies will probably be able to preserve
the peace, and the presence of the military will no longer
be required. A request for voluntary disarmament by all
the parties should be made before active measures are
taken. Elisha P. Ferry, *Governor.*"

Colonel Haines, not deeming the force at his disposal
sufficient to carry out the governor's suggestions, in reply
sent to him the following telegram:

"Gilman, July 2, 1891.

" *Hon. Elisha P. Ferry:*

" Does your order of to-day relative to disarming armed
bodies allow me to use, if necessary for its enforcement
without breach of the peace, any companies of this regi-
ment other than those now in the field ?

"J. C. Haines."

To which he received from the governor the following
answer:

"Olympia, July 2, 1891.

" *Colonel J. C. Haines Franklin:*

" You can use all of the first regiment for the purposes
indicated in my dispatch of this morning, if necessary.
"Elisha P. Ferry, *Governor.*"

The sheriff of the county, for the purpose of carrying
out the governor's suggestion in his first telegram of July

2, requested Colonel Haines to send a company to New-castle, one to Black Diamond and one to Franklin; there being but one company at the latter place, company D having been transferred to Gilman. On the 29th day of June Colonel Haines accordingly ordered company C to Black Diamond, company G to Newcastle and company I to Franklin. The first two companies were at the time the order was issued at their post in Pierce county, and proceeded by virtue of the order to the stations assigned to them. Company I, of Port Townsend, however, hap-pened to be at Seattle for the purpose of attending a drill, and, receiving the order there, proceeded to the station assigned to it. These companies remained in service until relieved from duty by the colonel commanding, company G being relieved on the 15th day of July. com-pany I on the 14th day of July, and company C on the 18th day of July. The various companies were in serv-ice in the field about three weeks, during which time the adjutant general, being by virtue of his office quarter-master general of the state, and having under his charge uniforms, arms, ammunition, tents, blankets and all the ordnance and quartermaster's stores of the state, supplied the same from time to time to the troops, upon requisi-tions from their officers, for use in this service, no objec-tion being made at any time by any officer of the state to the troops continuing in such service, or to their using the property of the state in performing it. Proper pay rolls were made out and presented to the board of mili-tary auditors for the pay of these troops, while in this service, by the paymaster, but audit of the rolls was re-fused on the ground that the persons in whose behalf said claims were presented were not, while the services for which their claims were presented were being performed, in the service of the state, and were, therefore, not entitled to pay out of the military fund; in short, the auditors held that the troops were a part of the *posse comitatus* of the

sheriff of King county, and must be paid by that county, if at all.

The statute in view of which Colonel Haines' telegram of June 24th was addressed to the governor is in the code of 1881, as follows:

"SEC. 860. If three or more persons shall be unlawfully, riotously or tumultuously assembled, any justice of the peace, sheriff, deputy sheriff, constable or marshal of a city, or mayor or alderman thereof, shall go among the persons so assembled, or as near to them as possible, and shall command them in the name of the Territory of Washington immediately to disperse. If the persons so assembled do not immediately disperse, it shall be lawful for every such officer to command sufficient aid; and to seize, arrest and secure in custody all such persons, and if necessary, an armed force may be called out, and shall obey the orders of any two of the magistrates or officers mentioned in this section, and if any such persons shall be killed or wounded by reason of their resisting the persons endeavoring to disperse or seize them, the magistrate or officers shall be held guiltless."

In so far as this section authorizes the officers therein mentioned to preserve the peace by using armed assistants, it is merely the reënactment of the common law. It became the statute law of the territory in 1854, before any organization of the militia was provided for. Several other sections in the code of 1881 stand with it and help to make it efficient, viz., § 886, which makes it a criminal offense to refuse to assist an officer; and § 2769, which relates particularly to the duty of sheriffs. It has always been the duty of magistrates and peace officers to preserve the public peace, even to the extent of calling to their aid every person within their jurisdiction, and they are, at common law, indictable for not doing so to the extent of their ability. *Rex v. Pinney*, 5 Carr & P. 254; Brightley's Binns' Justice, 804. And it has always been equally an offense for any person qualified for the service to refuse the demand

of the officer in a proper case. *Regina v. Brown*, 1 Carr. & M. 314; *Comfort v. Commonwealth*, 5 Whart. 437; *Republica v. Montgomery*, 1 Yeates, 419. That the force thus called out should be armed in some way would seem to go without saying, if the body of disturbers were large enough or defiant enough to require it. Therefore, that § 860 speaks of "an armed force" is not in our judgment a conclusive or convincing argument that the active militia of the state, as a military organization, is thereby intended.

It is pointed out to us that by the statutes of certain states, as Massachusetts, Iowa and California, the term "armed force," or "armed body," is used in connection with provisions which authorize magistrates and peace officers to summon the officers of military organizations composing portions of the state militia within their jurisdiction to assist them in keeping the peace and executing the law. But full examination discloses that in each instance the authority thus conferred is expressed in precise and unequivocal language, and is hedged about with such formal safeguards as under the perilous circumstances justifying such a use of the military must to every one seem absolutely necessary. In Iowa, by statute, when militiamen are thus employed, it is only upon the order of the sheriff, who may summon those within his county, and call upon the governor for others; and in that state the county is required to pay the expense of such military assistance. But this is not so in other states, at least by any published statute which we have observed, although in several others sheriffs and other peace officers are expressly authorized to call out the military within their several jurisdictions without previously communicating with the governor, who is invariably the commander-in-chief. The military, under our governmental system, in all ordinary cases, is kept in strict subordination to the civil power, a condition which is never removed except in case of invasion by a foreign power, or

insurrection of such serious proportions that all civil law is for the time suspended. Hence the highest executive of the civil power is invested with supreme command of the army of the state, to be held by him as a reserve for use only when the civil power shall be about to fail without its assistance; then it is put forth, as in the case at bar, cautiously and prudently to support the local civil officer until excitement subsides and men in their cooler feelings resume allegiance to the laws. It would seem to be an awkward state of affairs that a justice of the peace or the mayor of a city should suddenly assume control of a company or a regiment of troops without previous notice to or order from their superior officer; and we observe that wherever such is the law, it is provided that immediate notice of the calling out of troops shall be sent to the governor. But nothing of the kind is provided for here, and if it were to be admitted that § 860 means the national guard, when it says "armed force," it must follow that the orders of the local officers need in no way be communicated to the governor or any other military official, except the immediate commanders of the men required; and companies B, D and E could just as well have been sent by the sheriff from Seattle to Gilman or Franklin, or where not, without consultation with the colonel of the regiment as with it. Such would not be a military system, and we do not think we mistake when we say that his excellency the commander-in-chief would not have tolerated such proceedings for a moment. We hold, therefore, that the officers mentioned in § 860 could not directly require any organized portion of the first regiment to muster for the Gilman service.

But, being there, the next question is, were not these men in the service of the county? If they were part of the sheriff's *posse*, we find no authority for making them compensation out of the county treasury. The service of the citizen as a member of the *posse comitatus* is one which

is based purely on patriotism and strict duty, and has
never, so far as an investigation shows, been a compen-
sated service. They were not deputy sheriffs, who must
be appointed in a particular way, must give bonds, and
cannot be more numerous than the commissioners previ-
ously decide. Acts 1890, p. 312. Moreover, the counties
of the state are not responsible for the preservation of the
public peace and the execution of the laws. The officers
are so, and the counties are, by law, required to compen-
sate the officers to the extent of their salaries; but that is
all. In some of the states, as New York and Pennsyl-
vania, there are statutes under which certain counties
are liable for damages caused by rioters, but those are ex-
ceptional cases. *Darlington v. Mayer*, 31 N. Y. 164; 88
Am. Dec. 248; *County of Allegheny v. Gibson*, 90 Pa. St.
397; 35 Am. Rep. 670. Every offense committed is
against the peace and dignity of the state, and it is in
behalf of the state that all measures are taken to preserve
the peace and execute the laws. When the statutes im-
pose upon counties or other municipal bodies certain
duties and expenses in that behalf, they are bound to as-
sume them, but whatever is not thus imposed is not thus
assumed. We find, therefore, that these troops were en-
gaged in the state's business, and were, therefore, in the
state's service. Their position is well illustrated by the
case of *Ela v. Smith*, 5 Gray, 131; 66 Am. Dec. 356.
There the marshal of the United States was endeavoring
to execute the law by conveying a fugitive slave from the
court house to a wharf in the city of Boston, and a
bloody conflict was feared between those who were hostile
and those who were friendly to the execution of the law.
The marshal requested the mayor to call out the military
to preserve the peace while he did his duty as an officer,
not as a *posse* for his assistance, and an entire brigade
was so employed; and, although the object thus accom-
plished was the preservation of the peace of the city of
Boston, in as much as the troops were used at the direct

instance of the president, the United States paid the expense as though they had been called into the service of the government. In many instances in the history of the country the troops of the United States have been sent to the assistance of the states, as notably in 1887, when at many points railroad trains carrying the mails were threatened with stoppage by strikers. But, although the relation of the states to the United States has no analogy to that of counties to the states, it has never been thought of that the pay or subsistence of the regular army while thus engaged was a charge against the several states, the reasons being two—first, that the United States had a direct interest in the forwarding of the mails; and secondly, that it is bound by the constitution to guarantee each of the states against domestic violence when appealed to.

In the argument of this case stress was laid by both sides upon a critical examination of the several telegrams which passed between the governor and the colonel of the first regiment. But in the view we take of the matter, it matters little whether that of June 24th from the colonel be considered as a request for advice or the communication of a fact, viz., that one riot had occurred and more were threatened, or whether that of the governor, of date June 25th, was an order dependent upon a call by an officer named in § 860 for an armed force. Ample grounds existed, as shown by the petition, for the governor's order of that date; and, whether they did or did not, his excellency was the sole judge of the situation, and his decision was not to be questioned, either by the troops or the courts, or in any other way than that pointed out in the constitution. *Martin v. Mott,* 12 Wheat. 30; *Vanderheyden v. Young,* 11 Johns. 150.

Before leaving the case we desire to notice an argument which was used to sustain the position that the troops were not in the service of the state, viz., that they were not called out in accordance with the act of 1890 (Laws 1889–90, p.

627), defining the governor's duties.   In response to that,
in the first place, it cannot matter, so far as their right to
pay is concerned, whether there was reasonable ground for
calling them out or whether the call was formally correct,
or not.   The first, last and only duty of the soldier is to
obey the command of his superior officer when called upon
to march with his comrades, and if he does not obey he is
punished under the statute.   The supreme executive power
of the state is vested in the governor, and by the terms of
the militia article of the constitution he has power to call
forth the militia to execute the laws of the state.   Art. 10,
§ 2.   In this particular the language of our constitution is
in substance the same as that of the act of 1795, conferring
the same power on the president of the United States.
And the effect is the same, in that it places in his hands
the sole power of judging and determining, from the facts
in his possession, when the exigency has arisen which
makes it incumbent upon him to call forth the military
power of the state.   The act of 1890 begins with these
words: "In addition to those prescribed by the constitu-
tion, the governor has the powers and may perform the
duties prescribed in this and the following sections," but
as has been seen, the twelfth authority therein assumed
to be conferred already existed, being fully covered by the
phrase "to execute the laws of the state," in the militia
article.   The course of action there prescribed cannot be
binding upon the governor in any case where, in his judg-
ment, the danger of riot and bloodshed is so imminent
that time will not serve for the delay necessary to so many
antecedent formalities.

In these cases prevention is to be desired, not cure; and
it is to be hoped that for all time in this state, as in this
case, a show of force, without the firing of a shot, will be
sufficient to secure respect for the law and the safety of
the people.   From the petition here we learn that in a re-
mote, unpoliced district of King county, the sheriff was

attempting to do his duty against the greatest odds, and almost without possibility of assistance from the power of his county. Hundreds of misguided persons had already had one battle in which human lives were taken, and the coming of the morning's sun promised to see the fight go on. Certainly, then, if ever, was a time when prompt action was not only proper, but absolutely demanded. Upon the first telegram of the colonel of the first regiment, the governor's immediate response was, in substance, "If you are assured by any officer mentioned in § 860 of the code that an emergency exists at Gilman, go there with as many companies of your regiment as you think necessary, and assist the authorities in preserving the peace and enforcing the law." Thus the soldiery were sent to the neighborhood to be ready in case they were needed, and their mere presence proved sufficient. That no proclamation was issued cannot affect the validity of the action then taken, or the right of the soldiers to their pay. But at any rate § 37 of the military law of 1890, passed at a subsequent day of the session, must be read with the act in reference to the governor, and if there is conflict between the two, controls it; and if there were no such section it is not reasonable to suppose that the legislature intended to restrict the governor's constitutional authority by imposing a mandatory condition precedent to his action, which in many, if not the most, of the cases where he would be called upon to exercise it, would have the effect to delay his action until too late to be of any use.

Let the peremptory writ issue as prayed for. Costs of this cause to be taxed and allowed by the board of military auditors.

ANDERS, C. J., and HOYT, SCOTT and DUNBAR, JJ., concur.