(81 Misc. Rep. 262.)

### WELCH v. BARD, County Treasurer.

(Supreme Court, Special Term, Erie County. May Term, 1913.)

1. MILITIA (§ 15*)—CALLING OUT—ORDER OF JUSTICE OF SUPREME COURT—CONCLUSIVENESS.

Under Code Cr. Proc. § 111, and Military Law (Consol. Laws 1909, c. 36) § 115, authorizing justices of the Supreme Court to call upon the commanding officer of the National Guard for aid in case of an unlawful

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

or riotous assembly, etc., the issuance of the order by the justice is conclusive of the existence of the facts justifying its issuance, and is not subject to review or reversal.

[Ed. Note.—For other cases, see Militia, Cent. Dig. § 6; Dec. Dig. § 15.*]

2. MILITIA (§ 4*)—CALLING OUT—COMPENSATION AND EXPENSES—LIABILITY OF COUNTY.

Under Military Law (Consol. Laws 1909, c. 36) § 115, authorizing Supreme Court justices to call upon the commanding officer of the National Guard to aid the civil authorities in case of any breach of the peace, tumult, riot, etc., and requiring them to report their action and the circumstances of the case to the Governor and Major General, and section 211, making counties where such aid is rendered liable for the compensation and expenses of officers and enlisted men, a county was so liable, even though the attempt to confer such power on Supreme Court justices is unconstitutional, where the Governor and Major General recognized the validity of the justice's order by making no attempt to recall it, since the Governor had power to order out the troops, and his failure to disapprove was equivalent to a ratification of the justice's act.

[Ed. Note.—For other cases, see Militia, Cent. Dig. § 7; Dec. Dig. § 4.*]

3. OFFICERS (§ 30*)—HOLDING OTHER OFFICE—JUSTICES OF SUPREME COURT.

Code Cr. Proc. § 111, and Military Law (Consol. Laws 1909, c. 36) § 115, authorizing Supreme Court justices to order out the National Guard to aid the civil authorities, in case of a riotous assembly, breach of the peace, etc., do not violate Const. art. 6, § 10, providing that such justices shall not hold any other office or public trust, in view of the facts that such justices, as an incident of their office, are conservators of the peace, with power, independent of statute, to disperse riots and call upon posses to assist them, and that they act judicially in reaching a determination that a state of riot exists.

[Ed. Note.—For other cases, see Officers, Cent. Dig. §§ 37–43; Dec. Dig. § 30.*]

4. CONSTITUTIONAL LAW (§ 45*)—DETERMINATION OF VALIDITY OF STATUTES.

Statutes which have received executive, legislative, and judicial sanction for years should not be pronounced unconstitutional by a single judge, sitting at Special Term, except in a palpable case.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 42; Dec. Dig. § 45.*]

Application by Samuel M. Welch for a writ of peremptory mandamus against Franklin E. Bard, individually and as Treasurer of the County of Erie. Writ issued.

Louis L. Babcock, of Buffalo, for relator.
Thomas A. Sullivan, of Buffalo, for County Treasurer.

MARCUS, J. On the 8th day of April, 1913, there was a street car strike in the city of Buffalo. For several days prior to that time there had been an almost total cessation of street car traffic and much disorder in consequence thereof. On the evening of the 8th, Mr. Justice Brown called for aid upon the commanding officer of the Fourth Brigade stationed in Buffalo, and it must be assumed the call was made upon sufficient evidence to satisfy him that the facts stated in the order were true. Upon the service of this order General Welch immediately called his brigade in aid of the civil authorities, and his troops

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

were in active service in pursuance of such order until the 12th inst., when the same justice granted an order terminating the service and dismissing the troops.

Upon presentation of pay rolls duly certified to the county treasurer, that official, acting under instructions of the county attorney, refused to issue the certificate required by law upon which the money should be raised to pay the troops, on the ground that Mr. Justice Brown had no power to grant the order and that the same was void. Pay rolls aggregating over $19,000, covering the pay of over 2,000 troops, were rejected upon the claim that these citizen soldiers are debarred from receiving the compensation provided by law, because the order was illegal and void.

The organization of the National Guard is provided for in the Military Law of the state of New York. There are upwards of 15,000 men in this force. The Governor of the state is the Commander in Chief, and the active commander of the forces is the Major General. There are various brigades under the command of Brigadier Generals. The Fourth Brigade has its headquarters in Buffalo, and is composed of three regiments, two of which have their headquarters in Buffalo and the third at Rochester. The law provides that, in case men are warned for duty in aid of the civil authority, they must immediately obey the call, and in the event of their failure so to do they are subject to court-martial, which results in a fine or imprisonment. The officers and enlisted men of these commands have no recourse, except to obey the orders of their superiors. And so as to General Welch, upon receiving the order from Mr. Justice Brown, he likewise had no recourse save to obey it, and when his order was issued to the various organizations for duty, the officers and enlisted men of those commands had no recourse save to promptly obey. This force was scattered in various cities in the western end of the state, including places as remote from Buffalo as Oswego and Hornell. The entire force mobilized in Buffalo on the morning of the 9th. Every man who should have refused to obey such a call would have been punished and civilly disgraced.

It is claimed that the statute giving a justice of the Supreme Court full and complete authority to make such a call for aid—and which has been upon the statutes of this state for upwards of 30 years— is of no effect and void, and that the Legislature had no power to enact any law which imposes upon a justice of the Supreme Court any duty or function other than a judicial one, and that a justice of the Supreme Court may not exercise any public trust other than such as is connected with the jurisdiction vested in the Supreme Court by the Constitution of the state of New York, and that to that extent section 115 of the Military Law is unconstitutional and void; (2) assuming that the provisions of section 115 be valid and constitutional, still no condition existed in the state of New York at the time of the exercise of the power by Mr. Justice Brown that required the intervention of the military aid, and therefore the question of the necessity for the use of the military power at the time and occasion is one of fact, to be passed upon by "a court and jury," and any expenses incurred

thereon necessarily must be subject to a judicial determination by a court and jury.

An examination of the statutory authority under which this call was made shows that chapter 4 of the Code of Criminal Procedure deals with the prevention and suppression of riots. Section 102 provides that when a sheriff *or other public officer* authorized to execute process has reason to believe that resistance may be made, he may order out any military companies in the county to overcome resistance, and every person who refuses to comply with his order is guilty of a misdemeanor. Section 104. If the power of the county is not sufficient to execute process, the Governor must, on the application of the sheriff, order a military force from such other county or counties as are necessary. Section 106 provides that where five or more persons armed with dangerous weapons, or ten or more persons, whether armed or not, riotously assemble in a city, the sheriff, mayor and aldermen, supervisor, or the president or chief executive officer, the justices of the peace, or police justices must go among the people assembled and command them in the name of the people immediately to disperse, and the magistrates must arrest them if they fail to do so. Sections 106 and 107. It is made a misdemeanor not to disperse when ordered so to do. Section 111 provides as follows:

"Sec. 111. Officers Who may Order Out the Military.—When there is an unlawful or riotous assembly, with intent to commit a felony, or to offer violence to person or property, or to resist by force the laws of the state, and the fact is made to appear to the Governor, or to a judge of the Supreme Court, or to a county judge, or to the sheriff of the county, or to the mayor, recorder or city judge of a city, either of those officers may issue an order directed to the commanding officer of a division, brigade, regiment, battalion or company, to order his command, or any part of it (describing the kind and number of troops), to appear at a specified time and place to aid the civil authorities in suppressing violence and enforcing the law."

Section 112 provides that the commanding officer, when the order is given, must forthwith obey it, and the troops must appear to render the aid. Section 113 provides that, when an armed force is called out for the purpose of suppressing an unlawful or riotous assembly, it must obey the orders in relation thereto of either of the officers mentioned in section 111.

All of these provisions have been in the Code of Criminal Procedure since its enactment in 1881. From the above provisions it will be observed that a justice of the Supreme Court is vested with power to issue the call for aid, and the military authorities have no alternative save to obey. The present Military Law contains very full provisions along the same lines. Section 115 of the Military Law is as follows:

"Sec. 115. Civil Officers Who may Call on Commanding Officer for Aid and Conduct of National Guard and Naval Militia Officers.—In case of any breach of the peace, tumult, riot or resistance to process of this state, or imminent danger thereof, a justice of the Supreme Court, a county judge or recorder or city judge of a city or sheriff of a county, or mayor of a city, may call for aid upon the commanding officer of the national guard or naval militia stationed therein or adjacent thereto; such call shall be in writing. The commanding officer upon whom the call is made shall order out, in aid of the civil authorities, the military or naval force or any part thereof under his

command, *and shall immediately report what he has done and all the cir-cumstances of the case to the Governor and the Major General or the com-manding officer of the naval militia, as the case may be.* If it appear to the Governor that the power of the county be not sufficient to enable the sheriff to preserve the peace and protect the lives and property of the peaceful resi-dents of this county, or to overcome the resistance to process of this state, the Governor must, on the application of the sheriff, order out such military force from any other county or counties as is necessary.

"When an armed force is called out for the purpose of suppressing an un-lawful or riotous assembly, it must obey the orders in relation thereto of the civil officer calling it out, and render the required aid. The orders of the civil officer may extend to a direction of the general or specific object to be ac-complished and the duration of service by the active militia, but the tactical direction of the troops, the kind and extent of force to be used and the par-ticular means to be employed to accomplish the object specified by the civil officers are left solely to the officers of the active militia."

Section 117 describes how the men shall be warned for duty. Sec-tion 134 provides for the general court-martial of an officer who re-fuses to order out the troops under his command when required by law, and penalizes the officer to be sentenced to be dismissed from the service, and renders him liable for a fine not exceeding $100, or to a reprimand, or both; and section 135 renders an enlisted man liable to dishonorable discharge and to a fine of not exceeding $50 if he dis-obeys the call. If a man does not pay his fine, he can be imprisoned under section 145. Section 210 of the Military Law provides for the rate of pay. Section 211 deals with the pay of troops when aiding the civil authority and reads as follows:

"Sec. 211. Pay When Aiding the Civil Authority.—All officers and enlisted men while on duty, or assembled therefor, pursuant to the orders of a judge of the Supreme Court, sheriff of a county or mayor of a city, or any other civil officer authorized by law to make such a demand on the military or naval forces of the state, in case of riot, tumult, breach of the peace, resistance to process, or whenever called upon in aid of civil authorities shall receive the pay set forth in section 210 of this chapter; and such compensation and the necessary expenses incurred in quartering, caring for, warning for duty and transporting and subsisting the troops, as well as the expense incurred for pay, care, and subsistence of officers and enlisted men temporarily disabled in the line of duty, while on such duty, as set forth in section 223 of this chapter, *shall be paid by the county where such service is rendered.* The county treasurer of such county shall, upon presentation to him of vouchers and pay rolls for such expenses and compensation, certified by the command-ing officers of the organization or corps on duty in aid of civil authority in such county or counties, and approved by the Major General, if he be present in command where the duty is performed, or by the commanding officer of the brigade or of the naval militia to which the organizations or corps were attached, forthwith execute in behalf of and in the name of such county, a certificate or certificates of indebtedness for the money required to pay such vouchers and pay rolls; such certificates shall bear interest at the rate of not to exceed six per centum per annum, and shall be made payable on the first day of February following the expiration of two months from their issue, and the amount thereof shall be raised in the next tax budget of said county succeeding their issue, and applied to the payment of such certificates. Said county treasurer shall sell such certificates at public or private sale, and apply the proceeds thereof to the payment of such expenses and compensation. In the city of New York the duties hereby imposed upon a county treasurer shall be performed by the comptroller of said city, who shall raise the money necessary to comply with the provisions of this section by the issue and sale of revenue bonds of said city; the sum necessary to pay said bonds shall be

included by the board of aldermen and board of estimate and apportionment of said city in its final estimates for expenses of said city for the year succeeding that in which said bonds were issued. Any county treasurer or public officer, who shall neglect or refuse to perform any of the duties required by this section, shall be personally charged with the costs and all necessary disbursements of any action or proceeding brought to compel such performance, together with a reasonable additional allowance to the plaintiff or relator in such action or proceeding, to be fixed by the court."

It will therefore be noted that the sections dealing with the powers of a judge of the Supreme Court in relation to riot duty are based upon the existence of a breach of the peace, tumult, riot, or resistance to process, or the imminent danger thereof; and it will be assumed, in support of the order made in this case, that Mr. Justice Brown took all the steps and had before him such evidence as satisfied him of the existence of the necessary facts upon which his authority to act depended, and in the determination of the question of the existence of civil disorder the justice acted in a judicial capacity.

[1] It is urged on behalf of the county treasurer that the question of necessity for the use of military power is one of fact, which must be passed upon by a court and a jury, and that any expenses incurred necessarily must be subject to a judicial determination by a court and jury, and some authorities are urged in support of that contention.

In the case of Ela v. Smith, 5 Gray (Mass.) 131, 66 Am. Dec. 356, the marshal of the United States was endeavoring to execute the law by conveying a fugitive slave from the courthouse to a wharf in the city of Boston, and a bloody conflict was feared between those who were hostile and those who were friendly to the execution of the law. The marshal requested the mayor to call out the military to preserve peace while he did his duty as an officer, and an entire brigade was so employed for the preservation of the peace of the city of Boston, and it was there held that the determination of the mayor that a riot or mob was threatened was conclusive that the exigency existed. It was held that his judgment in the matter was judicial, and that the certificate of fact that a riot existed, made in good faith, was conclusive, and protected all acting under it. The Supreme Court of Massachusetts, speaking through Judge Bigelow, said:

"By the sections of St. 1840, c. 92, above cited, it is provided, among other things, that the mayor of a city, or any other of the civil officers therein designated, may, in case a 'tumult, riot or mob shall be threatened, and the fact be made to appear to' him, issue his precept, the form of which is prescribed by section 27, to call out a division or any smaller body of the volunteer militia 'to aid the civil authority in suppressing such violence, and supporting the laws.' In exercising the authority thus conferred, the statute makes it the first duty of the mayor or other magistrate to determine whether the occasion for calling out a military force exists. This depends on a question of fact, which it is his exclusive duty to determine. If it be made to appear to him that a tumult or riot is threatened, he may then issue his precept. He is, in his official capacity, and under the sanction of his oath of office, to examine and decide this question. This provision of the statute clearly confers a judicial power. Whenever the law vests in an officer or magistrate a right of judgment, and gives him a discretion to determine the facts on which such judgment is to be based, he necessarily exercises, within the limits of his jurisdiction, a judicial authority. So long as he acts within the fair scope of his authority, he is clothed with all the rights and immunities which appertain to judicial tribunals in the discharge of their appropriate functions.

Of these none is better settled than the wise and salutary rule of law by which all magistrates and officers, even when exercising a special and limited jurisdiction, are exempted from liability for their judgments, or acts done in pursuance of them, if they do not exceed their authority, although the conclusions to which they arrive are false and erroneous. The grounds of their judgment cannot be inquired into, nor can they be held responsible therefor in a civil action. Piper v. Pearson, 2 Gray [Mass.] 120 [61 Am. Dec. 438]; Clarke v. May, 2 Gray [Mass.] 410 [61 Am. Dec. 470]. This protection and immunity are essential in order that the administration of justice and the discharge of important public duties may be impartial, independent, and uninfluenced by fear of consequences. And they are the necessary result of the nature of judicial power. It would be most unreasonable and unjust to hold a magistrate liable for the lawful and honest exercise of that judgment and discretion with which the law invested him, and which he was bound to use in the discharge of his official duties. Nor would there be any security or safeguard to the magistrate or other officer against liability, however careful and discreet he might be in exercising his authority, if his judgments were to be examined into and revised in ulterior proceedings against him, in the light of subsequent events, upon new evidence, and with different means of forming conclusions from those upon which he was called upon to act in the performance of his duty. Such an ex post facto judgment might be more sound and wise, but it would not be a just or proper standard by which to try the opinions and conduct of an officer, acting at a different time and under other circumstances. Especially is this true in a case like the one at bar, where a public officer is compelled to decide and act promptly in a pressing emergency, and without time or opportunity for careful and deliberate consideration.

"If any argument were needed to strengthen this view of the nature of the power conferred by the statute in question, or to show that it is in accordance with the intent of the Legislature in creating that authority and jurisdiction, it may be found in the fact that the same power is granted by the statute to a court of record sitting within the county as is given to the commander in chief and mayors of cities. It is entirely clear that no liability could attach to the judge of a court for exercising his authority and judgment in a matter within his jurisdiction; and it is equally clear that the same rule must apply to other officers performing the same duty under the same grant of power. It follows, from these considerations, that the question whether a riot was actually threatened cannot be inquired into in this action. The judgment of the mayor upon it was conclusive, and having been rightly exercised within the limits of the authority conferred by law, no liability was incurred by him in issuing the precept by which the armed force was called out. Another result also follows as a necessary corollary: The precept of the mayor was in exact conformity to the terms of the statute. It was, therefore, a warrant regular on its face, issued by a magistrate of competent authority, within the scope of his jurisdiction. On familiar principles, it affords a complete justification to all those bound to obey its command, for acts lawfully done by them in pursuance thereof. Fisher v. McGirr, 1 Gray [Mass.] 45, 46 [61 Am. Dec. 381]; Whipple v. Kent, 2 Gray [Mass.] 413 [61 Am. Dec. 470]."

In the case of Martin v. Mott, 12 Wheat. 19, 6 L. Ed. 537, Mr. Justice Story had under discussion a case arising during the War of 1812 in this state, and held that the determination of the necessity for the calling forth of the militia by the President was, when exercised, conclusive and not subject to review by the courts.

In section 30 of Bargar's Law of Riot Duty, where laws authorized civil authorities to call out troops, the authorities so authorized have the power to determine when a call shall be made. For instance, the determination of a mayor of a city that a riot by a mob is threatened is conclusive that the exigency exists under the statute which author-

izes him to call out the militia to aid the civil authorities in enforcing the laws.

In the case of the Appeal of Hartranft et al., 85 Pa. 444, 27 Am. Rep. 667, the general principle is:

"That whenever the law vests any person with power to do an act, at the same time constituting him a judge of the evidence on which the act may be done, and contemplating the employment of agents through whom the act is to be accomplished, such person is clothed with discretionary powers, and is quoad hoc a judge. His mandates to his legal agents, on his declaring the event to have happened, will be a protection to those agents. Vanderheyden v. Young, 11 Johns. 158."

[2] If it is assumed that Mr. Justice Brown had the jurisdiction to make the order, then the fact that he did make it is conclusive, since he had the power under the statute to pass on the facts and make his call, and his action is conclusive, and not subject to review or reversal. His determination of the fact bound both the Brigadier General and the county, one to call out the troops, the other to pay. When this order was served upon the commanding officer of the militia in this district, he was required by law to report the circumstances to the Governor and Major General. All these officers, from the Governor down, necessarily recognized the validity of the call and acted upon it, since they ratified and sanctioned it, and never attempted to recall the order of Mr. Justice Brown.

The troops performed all the duties and services required of them. The order of the justice could not compel obedience, even if he had the constitutional power to make the call. The duty was performed under the call, and no official, civil or military, as far as it appears, made any request of the justice to revoke his order. The Governor, as commander in chief, certainly had the power upon his own volition to order out the troops to do riot duty, upon receiving sufficient information from responsible persons of a locality.

The practical working of the justice's call amounts to this: The justice is informed upon proof presented, and determines that an actual necessity or exigency exists, and issues a call for the troops. The commanding officer, upon whom the call is made to aid the civil authorities, in accordance with the Military Law, immediately reports all the circumstances of the case to the Governor and the Major General. The Governor undoubtedly had the power to recall the troops at any time. This he did not do, and it must be assumed that he believed the act of the justice to have been based upon satisfactory proof. This action, or nonaction, seems equivalent to an express order. He ratifies and confirms the act of Mr. Justice Brown, though not formally in writing, and to that extent approves the same. This is the legal effect of noninterference. If it be assumed or granted that the call of Mr. Justice Brown was invalid, and that the law vesting in him this power is unconstitutional, what material or essential difference does it make, in so far as depriving the soldiers of their pay, in view of the approval by nonaction on the part of the Governor?

It would therefore seem that the question of the unconstitutionality of Mr. Justice Brown's act is unimportant and nonessential, and is not the real point in issue. The county is but a civil political division of

the state, and it is not permitted to question the constitutional acts of the Governor or the legal consequence of his nonaction. Failure to disapprove may be equivalent to approval; ratification or approval is equivalent to an original authority.

The further question arises that, even though the call in and of itself was not strictly legal, must the militia lose their pay? The evidence, it must be assumed, conclusively showed that their services were necessary and that they rendered them. It was said in the case of Chapin v. Ferry, 3 Wash. 397, 28 Pac. 758, 15 L. R. A. 116, where it was questioned whether the troops were called out in accordance with a certain act defining the Governor's duties:

"In response to that, in the first place, it cannot matter, so far as their right to pay is concerned, whether there was reasonable ground for calling them out, or whether the call was formally correct, or not. The first, last, and only duty of the soldier is to obey the command of his superior officer when called upon to march with his comrades, and if he does not obey he is punished under the statute."

In this same case it is held:

"When the statutes impose upon counties or other municipal bodies certain duties and expenses in that behalf, they are bound to assume them; but whatever is not thus imposed is not thus assumed."

It is significant that the attorney appearing in this proceeding in behalf of the soldiers is acting under the authority and direction of the Governor and by his command, to enforce the claims pending against the county of Erie arising out of service of troops in aid of the civil authorities during the month of April, 1913.

[3, 4] It has been urged on behalf of the county treasurer that by reason of article 6, § 10, of the Constitution, which provides:

"The judges of the Court of Appeals and the justice of the Supreme Court shall not hold any other office or public trust"

—that the power to issue a call to the National Guard is a public trust, and therefore entirely foreign to the ordinary duties and powers which vest in the justices. Much argument and authority has been presented showing how the powers of the government are divided into three branches, the legislative, judicial, and the executive, and the attendant danger of the encroachment by one department upon the constitutional province of the other. But it should be noted that these provisions of the Code of Criminal Procedure and the Military Law have never been attacked, although the power now questioned was exercised in Erie county in 1891 and the bills of the troops duly paid; and there has been other exercise of this power by the Supreme Court judges, and the provisions in the Code of Criminal Procedure antedate the present Constitution. That being so, it fairly can be said that these acts in question have received executive, legislative and judicial sanction for many years, and it would require a much more satisfying discussion than has been presented to warrant the court in declaring so many sections of the Code of Criminal Procedure and the Military Law unconstitutional, when it is remembered that at least the rule of judicial propriety is that a single judge sitting at Special Term

should not, except in a palpable case, assume to pronounce an act of the Legislature a violation of the Constitution.

It has been urged upon the part of the applicant that the judges of the Supreme Court have always had the right to deal with riots and breaches of the peace, and that such duties are incident to the judicial function exercised by judges. It has always been the duty of magistrates and peace officers to preserve the public peace, even to the extent of calling to their aid every person within their jurisdiction, and they are at common law indictable for not doing so to the extent of their ability. Rex v. Pinney, 5 Carr. & P. 254.

It would seem that the question is one of inherent jurisdiction in this court, which exists to-day precisely as it came down from the English common-law and chancery courts, except as expressly limited by the organic law or statutes. The question is, of course, one of judicial power, and if the courts in England had the judicial powers in respect to riots and tumults, then it existed in our courts when the Constitution was first adopted. It was one of the inherent powers of the judiciary, and it was competent for the Legislature to codify the law or to revest such power in our judges whenever it deemed necessary. The Lord Chancellor of England had judicial powers in certain cases in reference to riots, and there can be no question but what a justice of this court now has the power, independent of these statutes, to disperse a riot and to call upon a posse to assist him. He has the power to arrest a rioter, and if he has the right to call upon citizens to make an arrest, there is no reason why he cannot call upon the National Guard as well as upon a posse.

I am of the opinion that the exercise of the power which culminated in the order granted by Mr. Justice Brown was incidental to his power as a justice of the Supreme Court, and not within the constitutional restriction, since the justices of the Supreme Court are manifestly conservators of the peace and have all the powers of officials known as magistrates. In any event, the delegation of power to a Supreme Court justice to call out the National Guard is not the exercise of another office or public trust within the meaning of the Constitution. Judge Vann, in the Matter of Davies, 168 N. Y. 102, 61 N. E. 121, 56 L. R. A. 855, said:

"While the performance of administrative duties cannot be imposed by the Legislature upon the Supreme Court, as such, except as to matters incidental to the exercise of judicial powers, yet for many years, and without serious question, acts have been passed conferring upon the justices of that court authority, out of term, to perform a' variety of functions, administrative or semiadministrative in character, such as the approval of certificates of incorporation, and the acknowledgment of conveyances, the solemnization of marriages, the appointment of commissioners of jurors, the investigation of the financial affairs of villages, and the like. 2 R. S. 756, § 4; L. 1847, c. 319, § 1; L. 1892, c. 682, § 64; L. 1892, c. 685; L. 1897, c. 194; L. 1897, c. 430. A distinction seems to prevail in practice between the powers conferred upon a court and those conferred upon the judges thereof."

But since it has been shown that a judge acts judicially in reaching a determination that a state of riot exists, there can be no breach of the organic law taking away the power from justice of the peace and lodging it in Supreme Court justices, and since it is the law that the

state and county shall be liable to an action on behalf of any party whose property has been destroyed or injured by riot, it would seem to be a proper exercise of a judicial power to commit to the justices of the Supreme Court the right to take the necessary steps to prevent great loss to the community.

This application presenting questions of law only, a peremptory writ may issue.