LORD & BURNHAM COMPANY, Plaintiff, *v.* CITY OF NEW YORK, Defendant.

Supreme Court, New York County, May 7, 1928.

**Municipal corporations — city of New York — claims — action to recover for labor and materials furnished by plaintiff in erection of garage during emergency due to imminence of war in 1917 — garage was for use of trucks of militia guarding section of water works — militia was called out by Governor at request of mayor, pursuant to Military Law, § 115 — commanding officer of regiment did not have to certify quality and quantity of materials and services required (Military Law, § 211) — signature of engineer of city precludes city from denying liability — emergency was sufficient to justify use of open order for contract — Greater New York Charter, § 419, not applicable — city is liable.**

This is an action to recover for labor and materials furnished by plaintiff for the erection of a garage for the use of motor trucks of the New York State National Guard while patrolling a section of the waterworks system of the city of New York during the emergency due to the imminence of war in 1917.   It appears that the militia was called out by the Governor of the State at the request of the mayor of the city of New York, pursuant to section 115 of the Military Law, and that in the course of its duties a detachment of the regiment assigned to the waterworks system proceeded to build barracks for housing the men and their equipment.   It further appears that while the construction work was going on, an open market order was issued directed to the plaintiff requesting it to furnish and deliver to the supply officer of the detachment a steel frame

---

* Parole Commission Law.

for a garage for him at his station and the services of foremen for a specified number of days at a price of $1,525. There was attached to the order a certificate bearing the signature of the supply officer and the assistant engineer of defendant's department of water supply in charge of the system on the division where the detachment was located, reciting that the work and supplies were necessary and the expenditure had been duly authorized and appropriated.

The commanding officer of the regiment did not have to certify the quality and quantity of the materials and services required, so that the signature of the commanding officer of the detachment was sufficient. (Military Law, § 211.)

The engineer of the city was the proper official to sign the contract and the city is estopped to deny his authority.

In view of the emergency the limitations of section 419 of the Greater New York Charter with respect to signatures did not apply.

Furthermore, the claim that the city received no benefit because the garage was to shelter State motor vehicles is unavailing.

Since the emergency was sufficient to justify the use of an open order for the contract, in view of the imminence of war, the city will not be heard to dispute the claim, and judgment must be awarded plaintiff.

ACTION to recover for labor and materials furnished in the erection of a garage.

*Ernest F. Griffin* [*P. T. Davis* of counsel], for the plaintiff.

*George P. Nicholson* [*Paul Livoti* of counsel], for the defendant.

McCook, J. John Purroy Mitchel, then mayor of the defendant city, on February 3, 1917, pursuant to section 115 of the Military Law of the State of New York (as amd. by Laws of 1916, chap. 355), requested the Governor of the State to order out such detachments of the National Guard and Naval Militia as might be necessary for the purpose of aiding the city authorities in the maintenance of law and order until such time as the same authorities might provide adequately against the commission of certain acts of violence and breaches of the peace. The document set forth the breaking off of diplomatic relations between the United States and the Imperial German Government; the commission within the city of New York during the year or more then last past of various acts of violence which constituted breaches of the peace, with the apparent purpose of embarrassing one or more of the belligerents engaged in the war in Europe; the danger, in the opinion of the mayor, of similar acts against property and public utilities of the city, which might be of disastrous proportions and consequence to the lives and welfare of the city's residents, and the fact that the civil authorities of the city had not sufficient and adequate forces at their disposal to properly and adequately guard against such acts.

The mayor of the city of New York, in taking this step, was no doubt actuated by regard for the city and a patriotic desire to

Supreme Court, May, 1928.                [Vol. 132

assist the State and Federal authorities. However, he need not have had recourse to such considerations, because he was held by the law to a sternly high degree of responsibility for the safety of life and property within his jurisdiction. One of the older links in the chain of precedent is an English case cited with approval by the American authorities (*Rex* v. *Pinney*, 5 Car. & P. 254; 110 Eng. Rep. 349), where the Court of King's Bench, in the form of a charge to the jury, by LITTLEDALE, J., pointed out what the mayor of a city must do under circumstances of existing or threatened disorder. The learned judge tells us, among other things, that he must use those means which the law requires to assemble a sufficient force for suppressing the riot and preventing mischief; that he should make such use of the force obtained and also of his own personal exertion to prevent such mischief as might reasonably have been expected from a firm and honest man. The mayor of New York city in 1917 did not wait for someone to blow up the bridges and cut off the food supply of six millions of people, or the aqueduct, and thus cut off the water supply of the same great population, but sought the Naval Militia to protect the one and the National Guard infantry to protect the other. Mayor Pinney, of Bristol, had to stand trial for permitting various public and private buildings to be plundered and destroyed, the prisoners to be released from gaol, and the city terrorized. Mayor Mitchel, when he followed the policy of timely prevention rather than of explanation after the event, was acting in accord with his legal duty no less than his own inclinations.

In response to the mayor's request the Adjutant-General of the State of New York, by direction of the Governor, issued Special Orders No. 30, under date of February 3, 1917, calling out certain bodies of Naval Militia and National Guard, among them the First Regiment Infantry, with the declaration " it appearing that there is necessity therefor." Under the order this regiment was assembled and detailed to protect, among other portions of the waterworks system of the city of New York, the section of the aqueduct in and around Millwood, N. Y. A detachment took its station at Millwood about August 20, 1917, and in the course of its duties, about November, 1917, proceeded to build barracks for housing the men and their equipment.

On December 22, 1917, Open Market Order No. 79, the paper here in litigation, was issued. It is headed by the printed words: " This copy of order to be retained by vendor the city of New York." Opposite the printed word " Dept." appears in typewriting " New York Guard." The order is directed to the plaintiff herein, and requests it to furnish and deliver to Captain L. B. de Garmo,

Supply Officer, First Provisional Regiment, at Millwood, N. Y., " one steel frame for garage for Supply Officer at Millwood, N. Y. * * * services of forman (sic) for 10 days to be furnished * * * price fifteen hundred and twenty-five dollars $1,525.00. Shipment in one week." Then follows a certificate that the work and supplies are necessary and that the expenditure has been duly authorized and appropriated. The order and certificate bear the signature of Captain de Garmo and the O. K. of Frederick S. Tebbutt, assistant engineer of the defendant's department of water supply in charge of the water works on the division including Millwood, and particularly the control of the water.

The supply officer of the First Regiment was its business manager, with the duty, among other things, to take charge of everything which pertained to housing, transportation, pay, feeding, clothing and quartering of the troops, including shelter of the personnel and property. He testified it was his incidental duty to purchase buildings, and that in his opinion the erection of the garage described in the open order was reasonably necessary to house motor trucks for the transportation of troops and supplies. In his opinion it was a temporary, not a permanent structure, and the detailed description is entirely consistent with that conclusion. The city offered no evidence to the contrary. The quantity, quality and prices of the material and work were certified to by the quarter-master sergeant (who checked them), the supply officer, the acting lieutenant-colonel, the assistant to the Adjutant-General of the State and the Adjutant-General himself. Mr. Tebbutt was the representative of defendant's department of water supply who located the barracks at Millwood and checked up against the guard on material. In this relation he approved the garage, which was connected with the barracks.

The defendant city admits the delivery of the goods and the performance of the supervisory labor in question; prompt delivery was testified to on behalf of the plaintiff, and not denied. The necessity for the garage, although denied, is not contradicted, and there is ample evidence of it, as already shown. In addition to the reasons for non-payment previously described the city makes the following points: That the charter provides for competitive bid under ordinary circumstances where an expenditure of over $1,000 is involved, which provision was not waived; that any emergency taking the case out of the general rule which might have existed on February 3, 1917, ended before December 22, 1917, through the entry of the United States into the World War on April 6, 1917, or in any event before May-June, 1918, when the labor and materials were supplied; that the Military Law does not cover

garages; that the order was not signed by the proper military officer nor by the proper city official.

Proceeding in reverse order, let us dispose first of the minor objections. It is frivolous to contend that the proper military authorities did not participate. Section 211 of the Military Law (as amd. by Laws of 1916, chap. 355)* provides for certification by " the commanding officers of the organizations or corps on duty." Defendant asserts that the signature of any order or voucher under this language should have been that of the colonel commanding the regiment, or of some person deputed by him as commander. It nowhere appears that the regiment was at the time commanded by a colonel, or that the acting lieutenant-colonel already mentioned was not in command of the whole regiment. Apparently he or de Garmo was the commanding officer of the " corps on duty " at Millwood. Every person in that detachment who might on any theory have been concerned, as well as the Adjutant-General, certified to the quality and quantity of the materials and services in question. Under these circumstances it is not seen what importance attaches to the information which the city's correspondence and testimony complain that it failed to receive from the Adjutant-General. The evidence does not disclose what information was desired or what bearing it. could have, if received, upon the defendant's failure to pay this claim.

As for the signature of the city's representative, Assistant Engineer Tebbutt, D. W. S., he was obviously the proper official, being charged with the particular duty of locating and checking up on the construction of the very barracks to which this garage was an adjunct. The plaintiff need not rest on waiver. The city is estopped to deny Tebbutt's authority to sign by every principle of fairness and law. Defendant admits that such an emergency as is contemplated by the authorities would take the case out of section 419 of the charter. If, therefore, the court holds such an emergency existed, the limitations of that section with respect to signatures do not apply.

The defendant claims the city received no benefit because the garage was to shelter State vehicles. Is it contended that because the city received *gratis* the use of State trucks for its benefit it was not benefited by the building which sheltered them? That the language of section 211 is broad enough to cover building a garage, as contrasted with any other necessary structure — say a barrack — scarcely admits of argument. It includes " the necessary expenses incurred in quartering, caring for, warning for duty and transporting and subsisting the troops." The characteristic and

---

* Since amd. by Laws of 1917, chap. 23, and Laws of 1921, chap. 588.— [Rep.

usual means for transporting the modern soldier and his supplies, such as food, clothing and ammunition, is the motor trick. The garage in question was designed to shelter motor trucks in a climate where such shelter is essential.

We now reach the most important question in the case, that is, whether there was such an emergency as justified the use of the open order in suit, instead of the customary sealed bid. It further resolves into two questions: Was there such an emergency on February 3, 1917, when the mayor substantially asserted its existence and the Governor by implication recognized the same? Did that emergency continue until December 22, 1917, when the city ordered these materials and services in a manner appropriate only to such an emergency? If so, the plaintiff should have judgment; if not, the order is invalid and this action should fall.

In *People ex rel. Welch* v. *Bard* (209 N. Y. 304), where one of the justices of the Supreme Court, declaring, " I am satisfied that breaches of the peace, tumults, riots, and other violations of the law are almost continually occurring within the city of Buffalo," called upon the commanding general of the National Guard Brigade, with headquarters in Erie county, for aid in their suppression, the county treasurer refused to provide for paying the troops so called out, and appealed from an order granting a peremptory writ of mandamus against him. WILLARD BARTLETT, J., writing for the Court of Appeals, held, among other things, that an emergency existed under section 115 of the Military Law, and sustained the writ. In the course of his opinion he cited *Ela* v. *Smith* (5 Gray [Mass.], 121) and *Appeal of Hartranft* (85 Penn. St. 433).

In the former case the mayor of Boston, pursuant to a statute resembling ours, called out a body of State troops to protect Federal officers in the exercise of their duty (transporting a fugitive slave), and the plaintiff was injured by some of the troops thus called. The decision raises the responsibility of the mayor for his act. The court said: " This provision of the statute clearly confers a judicial power. Whenever the law vests in an officer or magistrate a right of judgment, and gives him a discretion to determine the facts on which such judgment is to be based, he necessarily exercises, within the limits of his jurisdiction, a judicial authority. * * * The grounds of their judgment cannot be inquired into * * *. The existence of such authority is essential in a community where the first and most important use of law consists in preserving and protecting persons and property from unlawful violence."

In the *Hartranft* case the Governor resisted process by subpœna to compel him to disclose his reasons for calling out military forces to suppress certain labor riots. The court said: " The general

principle is that whenever the law vests any person with the power to do an act, at the same time constituting him a judge of the evidence on which the act may be done, and contemplating the employment of agents through whom the act is to be accomplished, such person is clothed with discretionary powers, and is *quoad hoc* a judge. * * * It follows, if the governor, as supreme executive, and as commander in chief of the army of the commonwealth, is charged with the duty of suppressing domestic insurrections, he must be the judge of the necessity requiring the exercise of the powers with which he is clothed." (See, also, *Chapin* v. *Ferry,* 3 Wash. 386.)

In the course of his famous opinion in *Martin* v. *Mott* (12 Wheat. 19), involving the power of the President to call upon the militia in emergency, Mr. Justice STORY, writing for the Supreme Court of the United States, said of the President that he is " necessarily constituted the judge of the existence of the exigency," and proceeded: " Whenever a statute gives a discretionary power to any person, to be exercised by him, upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts."

As is seen from the previously cited decisions by the highest courts of New York, Massachusetts, Pennsylvania and Washington, no difference is recognized between the responsibility of the President under a war act of Congress and that of a State executive under statutes applying to the State soldiery. The principle of *Martin* v. *Mott* is everywhere accepted as law within the States.

When the mayor of New York city and the Governor of New York State agreed as to the existence of an emergency and New York troops were called out in accordance with that theory, it was a matter of common knowledge what were the acts referred to; they were those of agents of the government with which ours had just severed relations. The dismissal of the German Ambassador was in itself a grave if not fatal portent. War was expected, and, as soon appeared, was at the time only about two months distant. All realized that with war would come further perils, known and unknown. It is not true, as defendant argues, that with the declaration of war would or did come the end of dangers, but rather the augmentation of them. In other words, the emergency was not momentary, but continuing. To supply one example, the removal from the city and State for Federal service of a large number of young men would and did deplete the reserves of youth relied upon to protect State and city, and render more essential the protection of vital utilities like the vulnerable New York water supply. As POUND, J., said in *People ex rel. Durham R. Corp.* v. *La Fetra*

(230 N. Y. 429, 440): "That it [a public emergency] existed; promised not to be self-curative, and called for action, appeared from public documents and from common knowledge and observation."

However, fortunately for the city of New York, it was unnecessary then, and is unnecessary now, to rely upon common knowledge. The competent authorities of State and city had alike declared that an emergency existed; from that moment, as matter of law, it did exist. How long did it continue? The Federal "War Time Prohibition Act" became a law on November 21, 1918, ten days after the armistice. It forbade the manufacture of certain beverages "after May 1, 1919, until the conclusion of the present war, and thereafter until the termination of mobilization (date to be determined by the President)." *Ruppert* v. *Caffey* (251 U. S. 264) was a suit to enjoin the enforcement of its penalties as amended by the Volstead Act, passed over the President's veto on October 28, 1919. Mr. Justice BRANDEIS wrote for the United States Supreme Court, holding that the War Time Prohibition Act was within the war powers of Congress when passed and had never become invalid by change of circumstances nor expired by its own terms when this suit was begun. (See, also, cases cited.) In the light of such a decision it seems futile to argue that any emergency of the State and city, due to the situation already appearing on February 3, 1917, was over by April 6, 1917, or for more than two years thereafter. To a similar effect, in connection with postwar emergency, see *People ex rel. Durham R. Corp.* v. *La Fetra* (*supra*).

The city's brief argues: "It is our contention that on the declaration of war in April * * * the troops should have been disbanded or federalized."

That is the difficulty with the whole position of the defendant. It presumes to say what should have been done at such a time. Those who bore the tremendous responsibility in 1917 fortunately recognized that when the nation's life is at hazard the city of New York is also in great danger, and cannot always pause to count the cost of wholehearted devotion to the common cause. They also realized, no doubt, how often in the history of the United States it has become necessary for localities to furnish means of defense not available to the general government at the moment; how often, for example, State forces have been necessarily employed, in time of war, in defense of their cities against foreign and domestic foes. The defendant appears to assume that civil disorder is not to be expected during the period of declared war. Such certainly had not been the experience of the city of New York in other wars. There is no basis for such an assumption. Lack of national

preparedness with war imminent has been the rule rather than the exception. The rich State and city of New York have often been and in this case were, better prepared than some others and had larger interests to protect. As matter of law, no less than as matter of sense, the emergency declared to exist in February, 1917, continued until declared terminated by similar authority — continued, that is to say, long after any period or date with which we are here concerned.

The time between December, 1917, and May, 1918, is asserted to have been ample to permit advertising for bids. In other words, if filling the order took under the best circumstances five months, it is argued that still more precious months might as well be lost. This reasoning defeats itself.

It follows that under such authorities as *Harlem Gaslight Co.* v. *Mayor, etc.* (33 N. Y. 309) and *North River El. L. & P. Co.* v. *City of New York* (48 App. Div. 14) this order is by the emergency taken out of the category of contracts covered by section 419 of the charter. The construction asked by the defendant city would obstruct the whole purpose of the provision, which is to safeguard the municipality, because then, in what might prove the time of its greatest need, it could not obtain the co-operation of its citizens in prompt and patriotic service. The people of the city of New York should not be compelled to risk, even temporarily, being deprived of their water supply. The horrors of a water famine in a community of such proportions are readily imagined. And yet, if this defendant can successfully resist payment for the garage which sheltered the military trucks, it might with equal logic decline to pay for the trucks which transported the food, clothes and ammunition for the soldiers, or even these three items themselves, thus rendering helpless the guards of the aqueduct. The city would be the greatest loser were it encouraged in the policy adopted in this instance.

If anything more is required to show at once the character of the obligation incurred and the shallow reasons for repudiation, it is found in the testimony of the deputy comptroller upon whose responsibility payment was refused. The finance department of the city established on its books an account, known in that department as " R. F. M. 54," to which were charged all items arising out of the guarding of the aqueduct, after proper approval. The title of the account was " Revenue Bond Fund for payment of extraordinary expenses incurred pursuant to section 115 of the Military Law." No appropriation was made for this account, but as and when bills properly chargeable against it were approved they were entered on the books under " R. F. M. 54 " and moneys were thereafter obtained for payment. By this title the city

recognized that they were expenses incurred pursuant to section 115 of the Military Law, and that they should, therefore, be paid as provided by section 211 of the same law. Similarly it recognized and established the existence of an emergency, and that the expense was due to calling out the troops because of such emergency.

The true explanation for non-payment appears to be that the deputy comptroller took it upon himself to set his judgment as to the character of and necessity for this garage above that of the persons qualified by study, experience and presence, whose judgment should have controlled.

To summarize: The city, confronted with a crisis due to the imminence of war, permitted this plaintiff to lay out money for labor and materials, and now seeks to repudiate an emergency order upon what, if the emergency be once accepted, seems but a flimsy pretext. Apart from the court's duty to enforce contract obligations and encourage fair business dealings, there is a consideration more important still, which is the reason the chief contentions of the defendant have been discussed at length. Ordinary caution and foresight require that the safety of the city in time of danger be so far as possible insured for the future. One of the best ways to secure this result is to discontinue the interposition of frivolous defenses to honest debts contracted on the spot.

Plaintiff will have judgment as on a directed verdict for $1,525, with interest, the interest to be allowed, however, only from September 7, 1922, the date when the claim was filed.