[No. 24519. *En Banc.* June 5, 1933.]

THE STATE OF WASHINGTON, *on the Relation of G. W. Hamilton, Appellant,* v. CLARENCE D. MARTIN *et al., Respondents.*[1]

[1]Reported in 23 P. (2d) 1.

*The Attorney General, J. H. Secrest, George Downer,* and *John W. Hanna, Assistants,* for appellant.

*Grinstead, Laube, Laughlin & Meakim, E. W. Anderson,* and *Yantis & Brodie,* for respondents.

*A. Emerson Cross* and *Earl W. Benson, amici curiae.*

HOLCOMB, J.—Appellant commenced this action in the court below to permanently enjoin and restrain respondents, who constitute the state finance committee, from enforcing, carrying out and administering the provisions of chapter 65, Laws of 1933, p. 336, which authorizes the state finance committee to execute, issue and sell from time to time general obligation bonds of the state in the sum of ten million dollars. In appellant's complaint, the constitutionality of the act is challenged, alleging that it violates eight separate sections of our state constitution, and further alleging that, in many of its provisions, it conflicts

with other existing laws and therefore was inoperative and void. A general demurrer interposed by respondents was presented and, after argument, sustained by the court below. Appellant refusing to further plead, the action was dismissed, from which judgment this appeal is taken.

Chapter 65, Laws of 1933, p. 336 [Rem. 1933 Sup., § 9992-35], is referred to as the "bond act," and chapter 8, Laws of 1933, p. 103 [*Id.*, § 9992-1], which is an interrelated act, is referred to as the "relief act."

In § 1 of the bond act, designated the preamble, the legislature sets forth the conditions which lead to its enactment. It recites a number of reasons therefor, among others, that:

"Discontent, social unrest and incipient insurrection exist. Acts of insurrection are occurring. . . . A critical emergency calling for constructive action is presented; otherwise catastrophe impends. . . . It is imperative that existing unemployment and distress be in some measure allayed. . . . This obligation is upon the state. Legislation is essential for its fulfillment." Rem. 1933 Sup., § 9992-35.

Section 2 authorizes the creation of a state debt and the issuance and sale of bonds in the sum of ten million dollars to carry out the purposes and provisions of chapter 8, Laws of 1933, p. 103, prescribes the terms of such bonds and the manner of their sale. Respondents, who are members of the state finance committee, are charged with the duty of issuing and selling bonds. Section 3 appropriates the proceeds of the bonds for the purpose of paying expenses incurred under and carrying out the provisions of chapter 8, *supra*. Section 4 authorizes temporary loans from the general fund in anticipation of the issuance and sale of the bonds. Sections 5 and 6 provide for the retirement of the bonds. Section 7 is the emergency clause. The retirement provisions appropriate the equivalent of

four-tenths of one cent a gallon of the liquid fuel tax from the motor vehicle fund for primary retirement and interest purposes, and any deficiency is authorized to be raised by general tax levy.

There is no provision made for the submission of the bonds to the people of the state for their approval or rejection.

The relief act, which is interrelated with and referred to in the bond act, has for its purposes, as determined from its title, first, to relieve the people of the state from hardships and suffering caused by unemployment, which is identical with one of the objects sought to be obtained by the enactment of the bond act. The relief act further creates what it terms an emergency relief administration and defines its duties. It makes an appropriation in the sum of twenty thousand dollars, or so much thereof as might be necessary, for setting up the machinery for the operations of the act.

Both acts were passed with an emergency clause attached.

Appellant first recites the provisions of amendment 14 to our state constitution, reading:

"All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax and shall be levied and collected for public purposes only."

Subdivision (b) of amendment 7 to our state constitution is next set out, reading:

"(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions."

It is further alleged that the bond act violates §§ 1, 2 and 3 of Art. VIII, of our constitution, which read:

"§ 1. LIMITATION OF STATE DEBT. The state may, to meet casual deficits or failure in revenues or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed four hundred thousand dollars ($400,000), and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained, or to repay the debts so contracted, and to no other purpose whatever."

"§ 2. POWERS EXTENDED IN CERTAIN CASES. In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or to defend the state in war, but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and no other purpose whatever."

"§ 3. SPECIAL INDEBTEDNESS, How AUTHORIZED. Except the debt specified in sections one and two of this article, no debts shall hereafter be contracted by or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. No such law shall take effect, until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election, and all moneys raised by authority of such law shall be applied only to the specific object therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county, if one be published therein, throughout the state, for three months next preceding the election at which it is submitted to the people."

It cannot be doubted that the indebtedness and tax appropriated to its payment, being for the relief

of state-wide unemployment and poverty, are for a public purpose and permissible under amendment 14, *supra,* if otherwise valid. *Rust v. Kitsap County,* 111 Wash. 170, 189 Pac. 994; *Rummens v. Evans,* 168 Wash. 527, 13 P. (2d) 26; *Kruesel v. Collin,* 170 Wash. 233, 16 P. (2d) 442; 21 R. C. L. 701.

Nor can it be doubted that the title to chapter 65, the bond act, which is general rather than restrictive in its scope, sufficiently complies with the constitutional provision as to titles to enactments. *In re Hulet,* 159 Wash. 98, 292 Pac. 430, and cases cited.

Neither can it be doubted that the emergency clauses are valid under our seventh amendment if the legislation is otherwise valid; since, if the emergency justifying the legislation is not necessary and valid, it is palpably plain that the legislation is such that it could not be enacted without submitting to a popular vote for approval, under our constitution, Art. VIII, § 3.

The principal question to be determined is: Are the bonds valid without popular submission and approval, within the meaning of § 2, Art. VIII, of our constitution?

An act of the legislature is only to be overthrown by virtue of some specific limitation or prohibition in the paramount law. Where a doubt exists the act is sustained. *State ex rel. Case v. Howell,* 85 Wash. 294, 147 Pac. 1159, Ann Cas. 1916A, 1231; *State ex rel. Short v. Hinkle,* 116 Wash. 1, 198 Pac. 535; *State ex rel. Campbell v. Stewart,* 54 Mont. 504, 171 Pac. 755; *Baker v. Hill,* 180 Ark. 387, 21 S. W. (2d) 867; *Hovey v. Foster,* 118 Ind. 502, 21 N. E. 39.

It must be remembered, also, that the governor is a part of the legislative authority of the state; and the governor approved the legislation we have now before us, thus approving both the necessity for the

combined legislation and the emergency existing. As was said in *Gottstein v. Lister*, 88 Wash. 462, 497, 153 Pac. 595, Ann. Cas. 1917D, 1008:

"The courts are not the sole guardians of the constitution, and while it is necessary that each department of the government heed the mandates of that instrument, it is no less important that the courts should not reach out beyond their constitutional sphere to question and draw to themselves duties and powers which belong to the other departments of the government."

Our constitution also provides that:

"The governor shall have power to call forth the militia to execute the laws of the state to suppress insurrections and repel invasions." Art. X, § 2.

In a contingency under this provision of the constitution, where it was shown only that there were dangers of destruction to life and property in two communities in one county in the state, Governor Ferry ordered the state militia to the localities in order to prevent destruction of life and property. *Chapin v. Ferry*, 3 Wash. 386, 28 Pac. 754, 15 L. R. A. 116. In that case, we said:

"Ample grounds existed, as shown by the petition, for the governor's order of that date; and, whether they did or did not, his excellency was the sole judge of the situation, and his decision was not to be questioned, either by the troops or the courts, or in any other way than that pointed out in the constitution."

We there, also, said:

"In these cases prevention is to be desired, not cure; and it is to be hoped that for all time in this state, as in this case, a show of force, without the firing of a shot, will be sufficient to secure respect for the law and the safety of the people."

Prevention is always better than cure, whether in the body politic or in the human body. Disorders which

constitute "incipient insurrection" were declared by the legislature and approved by the governor as existing in this state at the time the combined legislation was enacted. It would seem to any rational mind that it is far better to cure insurrection or incipient insurrection by promoting prosperity rather than by the use of bullets.

It is not to be considered that our constitution makers contemplated that there must be actual, armed, insurrection, with bloodshed, before taking steps and providing means with which to suppress it. "Suppress" means "to prevent," as well as to subdue or put down by force, as defined in *Chapin v. Ferry, supra.* Lexicographers define "insurrection" as

"Action or act of rising against civil or political authority, or the established government; open and active opposition to the execution of law in a city or state;—usually implying less magnitude and success than there is in case of rebels, etc." (Webster's New Int. Dict.)

This does not connote armed opposition or resistance. "Incipient" means "beginning to be, or to show itself; commencing; initial." (Webster's New Int. Dict.)

In *Rummens v. Evans, supra,* this court took notice of the economic and financial conditions then existing (June 30, 1932). All men know and we, as judges, must know that the conditions then existing were probably intensified until the legislature of 1933 met and passed the combined legislation here in question. Widespread hunger and privation, unrelieved, inevitably lead to disorder and reprisal. Unless the same be relieved, insurrection is indeed possible.

Here, the legislature declared and the executive approved the declaration that "Discontent, social unrest

and incipient insurrection exist. Acts of insurrection are occurring."

We have always held to the rule that the legislative declaration of the facts constituting the emergency is conclusive, unless, giving effect to every presumption in its favor, the court can say that such legislative declaration, on its face, is obviously false and a palpable attempt at dissimulation. *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11; *State ex rel. Case v. Howell, supra; State ex rel. Short v. Hinkle, supra; State ex rel. Reiter v. Hinkle,* 161 Wash. 652, 297 Pac. 1071. In the recent case of *State ex rel. Burt v. Hutchinson, ante* p. 72, 21 P. (2d) 514, the majority held that the legislation there in question was not necessary for the immediate preservation of the public peace, health or safety, or support of the state government and its existing institutions; and that the legislative declaration was unjustifiable and untrue, and, therefore, violative of the seventh amendment.

It is also well settled, both here and elsewhere, that, in determining the truth or falsity of a legislative declaration of a fact, the court will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by its judicial knowledge. Cases above cited; *State ex rel. Govan v. Clausen,* 108 Wash. 133, 183 Pac. 115; *Hovey v. Foster, supra; Franklin v. State Board Examiners,* 23 Cal. 173; *People v. Pacheco,* 27 Cal. 176; *Trustees of Cass Township v. Dillon,* 16 Ohio 38; *Gustafson v. Rhinow,* 144 Minn. 415, 175 N. W. 903; *Commonwealth ex rel. Schnader v. Liveright,* 308 Pa. 35, 161 Atl. 697.

In our *Govan* case, *supra,* we quoted with approval from an earlier case, *Farquharson v. Yeargin,* 24 Wash.

549, 64 Pac. 717, and from a California case sustaining the rule above stated and that

"The authority and duty to ascertain the facts which ought to control legislative action are, from the necessity of the case, devolved by the constitution upon those to whom it has given the power to legislate, and their decision that the facts exist is conclusive upon the courts, . . ."

We therefore held that

" . . . in passing upon the constitutionality of a statute, the court must confine itself to a consideration of those matters which appear upon the face of the law, and those facts of which it can take judicial notice."

Cf. *Gustafson v. Rhinow, supra.*

The California constitution is like ours, but limits state indebtedness to three hundred thousand dollars, except in case of war, to repel invasion, suppress insurrection, etc. The *Franklin* case, *supra,* involved the validity of an act to relieve enlisted men in the civil war, the state's indebtedness being, at the time, in excess of three hundred thousand dollars. The supreme court said:

"The existence of the emergency calling for the exercise of the power is purely a political question, and the Legislature, as the body in whom the political power of the State is vested, are the sole judges as to the existence of such emergency. It is the exercise of a purely political power, upon a political subject, in no manner of a judicial character, and it is not, therefore, subject to review, or liable to be controlled by the judicial department of the State. The Legislature is, therefore, the proper judge of the construction to be given to the Constitution upon this subject."

The *Pacheco* case, *supra,* reaffirmed the decision in the *Franklin* case, *supra,* although the later case involved only the construction of a railroad in California during the civil war, the act declaring in a preamble

that a state of war existed and that the railroad should be constructed as soon as possible to repel invasion, suppress insurrection, and defend the state against its enemies.

The *Hovey* case, *supra,* decided by the supreme court of Indiana, is a strong and well-reasoned case to the same effect as our *Govan* case, *supra.*

The supreme court of Pennsylvania in the *Liveright* case, *supra,* among other things, well said at page 88:

"The poverty that has now become a menace to the well-being and peace and good order of the Commonwealth is poverty born of involuntary unemployment and no one even suspects or hints any other parentage. . . .

"The greatest menace to the well-being and safety of the State is for it to have hundreds of thousands of its able-bodied and willing citizens suffering, with their families, from hunger and lack of clothing and shelter because work is unobtainable. An appropriation from a public treasury to relieve this suffering is no more a 'charitable' appropriation than an appropriation made to suppress an uprising, repel an invasion or to combat a pestilence."

See, also, *Rummens v. Evans, supra.*

Whether or not the combined legislation before us accomplishes the intended purposes, remains to be seen. The wisdom and expedience thereof are not our concern. Their obvious aims are to prevent insurrection by civilized methods, rather than by violence and bloodshed. It is not for the courts to say that the facts found by the lawmakers were obviously false, or a palpable dissimulation.

We conclude that the laws in question violate none of the limitations and restrictions hereinbefore set out and relied upon by appellant.

The judgment is affirmed.

BEALS, C. J., BLAKE, MITCHELL, and MAIN, JJ., concur.

TOLMAN, J. (dissenting)—I am unable to concur in the reasoning or in the results reached by the majority.

The constitutional provision we are called upon to construe is simple and plain in its terms and mandatory in its character. It has stood unquestioned and uninvaded as the supreme law of the state for more than forty years. It is dual in its provisions and each branch is an integral part of the whole. It provides:

"The state may contract debts to repel invasion, suppress insurrection, or to defend the state in war, but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and no other purpose whatever." Constitution Art. VIII, § 2.

So that, to come within its terms, the indebtedness authorized must be (so far as is here material) plainly (1) to "suppress insurrection", and (2) the money so obtained "shall be applied to the purpose for which it was raised and no other purpose whatever." Stronger or more mandatory language would be hard to frame.

In my opinion, on the face of the act, without even invoking judicial knowledge in any degree, the act fails to meet the constitutional requirement. The title of the act, Laws of 1933, p. 336, reads:

"An Act to relieve the people of the state from hardships and suffering caused by unemployment, through the agency of the emergency relief administration, creating a debt, authorizing the issuance and sale of state bonds, creating a sinking fund to be known as the 'General Obligation Bonds of 1933 Retirement Fund' and allocating a portion of receipts in the motor vehicle fund thereto for the payment of interest and principal of said bonds, providing for a tax levy to cover any deficiency therein, making an appropriation therefrom, declaring an emergency and that the act shall take effect immediately."

showing clearly that, under the constitutional mandate as to titles, the act is one for relief simply and solely.

The preamble of the act recites certain distressing conditions, but even with a liberal construction of the language there used, these conditions are such as call for relief only, and not at all for suppression.

Section 3 of the act provides that the moneys realized from the sale of the bonds shall be deposited to the credit of the special fund for relief, created by chapter 8, Laws of 1933, p. 103, and not a penny can be used for any other purpose. Chapter 8, above referred to, is a relief act pure and simple. Its title reads:

"An Act to relieve the people of the state from hardships and suffering caused by unemployment; creating and defining the duties of an emergency relief administration, and making an appropriation for such purpose; providing penalties, and declaring that this act shall take effect immediately."

Not one dollar going into the fund created by chapter 8 can be used to suppress insurrection or for any purpose save relief of the distressed as in that act provided.

Therefore, giving the words of the constitution their plain and ordinary meaning, this act on its face is for the relief of the distressed solely, and not for the suppression of anything. The moneys borrowed are not to be, and cannot be, used under the terms of the act to suppress insurrection.

It is urged that prevention is better than cure, and that therefore to prevent violence and insurrection is in law synonymous with suppression. That invokes a new and untried rule of constitutional construction and one, I fear, which would make the constitution the plaything of the legislature and the courts. No one could ever know in advance with any certainty the meaning of the constitution upon any subject, and it

might be construed one way today and another to-morrow, according to the peculiar policy or thought prevalent at the time. This cannot be a sound rule. All authorities agree that the constitution, and its terms, must mean the same thing at all times, and all authorities hold that the words of the constitution must be given their plain and ordinary meaning. The plain and ordinary meaning of the word "suppress", at the time the constitution was adopted, and now, is "to crush, to put down by force", and no amount of sophistry can change, alter or soften the force of the word "suppress".

Moreover, the prevention argument wholly ignores the constitutional mandate that the money so borrowed be used solely to suppress insurrection, or else it assumes that every one of our distressed citizens is a potential insurrectionist. If the constitutional inhibition is kept in mind, and it be conceded that prevention is synonymous with suppression, the relief from this source can be accorded only to that small minority (if any there be) of our distressed citizens who are now ripe for violence and insurrection. There is nothing in chapter 65 or in chapter 8 which attempts to separate and segregate the dangerous element in our population, if there be such, and to apply the money to prevent them from proceeding to open violence. Using the money generally for the relief of the distressed, without reference to whether they are law abiding or not, is, of itself, a direct violation of the second part of the constitutional provision which I have quoted.

The purpose and intent to relieve the distress of our people is a most worthy one, in which I deeply sympathize; but only as a last resort, even if then, can the constitution be destroyed to serve humanitarian purposes. There is ample material and wealth now within our state to relieve every worthy distressed

person. The state has almost unlimited powers of taxation, and until, by the use of its power to tax, the state has consumed the wealth within its borders, we have no right to set aside a plain constitutional mandate and pass the results of our own lack of foresight on to our children and our children's children.

As a general rule, the courts are not concerned with questions of public policy, and such questions should usually be left to the legislative and executive departments of the state. Yet, as the constitution by its terms forbids the financing of relief by a bond issue exceeding four hundred thousand dollars, unless sanctioned by popular vote, I feel justified in pointing out that the constitution itself fixes, by these provisions, the public policy of the state, and in the constitutional sense this act offends against public policy.

What man in his private affairs deliberately incurs a debt to relieve his present distress and passes it on to his descendants to pay after his death? Governments should follow the sound rule which applies to the individual, and presently pay for present relief. I cannot think it sound policy or sound morals for the state to ask its future citizens to pay for the distress and suffering which occurred, perhaps, before they were born, and for which they were in no wise responsible. We who are living are responsible. The duty to relieve is ours, and until we have expended our last dollar in that direction we have no right to burden and enslave future generations to pay for our own mistakes and follies.

The act violates the constitution and is contrary to sound public policy. In my judgment, it should be held void.

I therefore dissent.

STEINERT and MILLARD, JJ., concur with TOLMAN, J.