[No. 42818.    En Banc.    July 11, 1974.]

ROBERT ANDERSON *et al., Petitioners*, v. ROBERT S. O'BRIEN, *as Treasurer of State, Respondent.*

*Slade Gorton, Attorney General, Malachy R. Murphy, Deputy,* and *William A. Coats, Assistant,* for petitioners.

*Slade Gorton, Attorney General,* and *Philip H. Austin, Deputy,* for respondent.

*Dellwo, Rudolf & Schroeder (Robert D. Dellwo,* of counsel), amicus curiae.

UTTER, J.—Petitioners, members of the Economic Assistance Authority, seek a writ of mandamus to compel respondent O'Brien, as state treasurer, to sign a warrant issued by that authority to the Kalispel Indian Community. The treasurer, acting on advice of the Attorney General, refused to sign the warrant because of statutory and constitutional questions raised by the proposed disbursement.

The broad question presented by this original proceeding in the Supreme Court is whether, consistent with the Economic Assistance Act of 1972 (RCW 43.31A) and the Washington State Constitution, state funds may be disbursed to a federally recognized Indian tribe for the purpose of developing and constructing an industrial site and building to be leased to private manufacturing firms in order to stimulate job opportunities and reduce unemployment for the tribe.

We hold, first, that the Kalispel tribe is a proper recipient of state funds under the Economic Assistance Act of 1972 and the state constitution, as an entity with wholly public functions; second, that the legislature authorized expenditure of state funds for the purpose of developing and constructing an industrial site and building for lease to private individuals to stimulate job opportunities and reduce unemployment; and, third, that stimulation of job opportunities and reduction of unemployment by this method is a constitutionally permissible means by which to accomplish this objective.

The Kalispel Indian Community is a federally recognized Indian tribe and chartered as a body politic incorporate under the Indian Reorganization Act of 1934, 25 U.S.C. § 477 (1970). In 1970, out of a labor force of 56 in the reservation community, 40 members of the tribe were unem-

ployed and only 16 employed. Twelve of the employed were working on a part-time basis, three on a seasonal basis and one employed full time.

Of the total proposed sum of $300,064 to be disbursed by the authority, $100,064 is a loan and $200,000 is an outright grant. Expenditures within the sum approved by the authority were:

| | |
|---|---|
| Site preparation | $ 16,100 |
| Water | 23,400 |
| Sewer | 25,800 |
| Building | 202,940 |
| 10 percent contingency and inspection fee | 31,824 |
| Total | $300,064 |

The project will involve construction of an industrial building where space will be leased to manufacturing firms. One firm is committed to lease space and the tribe is prepared to negotiate with the second firm. There will be room for expansion and lease to others. Eighteen permanent job positions will be created initially to expand to an eventual 30 permanent positions.

The first issue is whether the Kalispel tribe is a proper recipient of state funds under the Economic Assistance Act of 1972 and the state constitution. RCW 43.31A.070 explicitly provides that: "The authority is authorized to make direct grants and/or loans to political subdivisions of the state and Indian tribes recognized as such by the federal government . . ." The Washington State Constitution does not dictate otherwise.

Article 8, section 5 of the state constitution provides that: "The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation." In *Rands v. Clarke County*, 79 Wash. 152, 157, 139 P. 1090 (1914), we recognized that this constitutional prohibition is not applicable to corporations or entities whose functions are wholly public:

Plainly . . . the framers had in mind individuals, associations, companies and corporations engaged in

purely private enterprises, or enterprises only quasi public, not to enterprises carried on by the corporations whose functions are wholly public, such as the Federal or state government, or some branch thereof.

■ Indian tribes are unique entities which do not fit into neat pigeonholes of the law. Their sovereign characteristics are well recognized. *State v. Bertrand,* 61 Wn.2d 333, 339, 378 P.2d 427 (1963). The federal government recognizes the right of a tribe to organize for its common welfare. 25 U.S.C. § 476 (1970). These attributes of sovereignty qualify the tribe as an entity with wholly public functions. The selection of the Kalispel tribe as a recipient for assistance in the form of state funds is not prohibited by article 8, section 5.

■ The second question is whether the items approved by the Economic Assistance Authority for the proposed Kalispel industrial park are authorized under the Economic Assistance Act of 1972. The problem is one of statutory construction. The primary objective of statutory construction is to carry out the intent of the legislature. *Amburn v. Daly,* 81 Wn.2d 241, 501 P.2d 178 (1972). Where the manifest object of a statute can be ascertained and the statute is susceptible of two constructions, that construction should be given which will carry out the intent of the legislature. *Miller v. Paul Revere Life Ins. Co.,* 81 Wn.2d 302, 501 P.2d 1063 (1972).

The statement of purpose in the act is the primary insight into the intent of the legislature in this case. It states the act's purpose is to foster economic development by two means—the stimulation of investment and job opportunity. In addition to fostering economic development by these means, the legislature also declared reduction of unemployment to be of major concern to the economic welfare of this state. RCW 43.31A.010.[1] One of the means authorized

---

[1] RCW 43.31A.010:
"Declarations. It is declared to be the public policy of the state of Washington to direct financial resources of this state toward the fostering of economic development through the stimulation of investment and

by the legislature to accomplish these purposes is to make direct grants or loans to government agencies to assist them in financing the cost of "public facilities." RCW 43.31A.070. The act next requires that public facilities grants and/or loans be used for projects which "will improve the opportunities for the successful maintenance, establishment, or expansion of industrial or commercial plants or will otherwise assist in the creation or retention of long-term economic opportunities." (RCW 43.31A.080: Projects for which grants or loans may be used—Priority.)

RCW 43.31A.070 authorizes grants or loans to finance the cost of "public facilities." RCW 43.31A.110(2) then clarifies the use which can be made of public facilities by allowing their use "directly *or indirectly* for any facility for public purposes, including, but not limited to, sewer or other waste disposal facilities, arterials, bridges, access roads, port facilities, or water distribution and purification facilities." (Italics ours.) A public facility is, then, "any facility for public purposes,"[2] and inasmuch as reducing unemployment is a valid public purpose[3] and the proposed building for lease will create jobs, the project is a public facility.

The Economic Assistance Authority, which was designated by the legislature to carry out the purpose of the act, has concluded that the expenditure would be appropriate. This raises a strong presumption that the project would further the public purpose specified in the act and an administrative construction of an ambiguous statute should be given great weight. *Deaconess Hosp. v. State Highway Comm'n,* 66 Wn.2d 378, 403 P.2d 54 (1965); *Bradley v. Department of Labor & Indus.,* 52 Wn.2d 780, 329 P.2d 196 (1958). In addition, the legislature expressly stated in

job opportunity in order that the general welfare of the inhabitants of the state is served. The legislature further finds that reducing unemployment as soon as possible is of major concern to the economic welfare of the state."

[2] RCW 43.31A.110(2).

[3] *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 23 P.2d 1 (1933).

RCW 43.31A.110(2) that permissible projects were "not limited to" the enumerated examples.

Even if the phrase "not limited to" is ignored, the inclusion of port facilities as illustrative of the type of public purpose allowable, gives the Economic Assistance Authority broad latitude. The term "port facility" has been given a statutory definition in other states.

Section 315.02(6), Florida Statutes, F.S.A. defines a port facility as follows:

"The term 'port facilities' shall mean and shall include harbor, shipping and port facilities and improvements of every kind, nature and description, including (but without limitation) channels, turning basins, jetties, breakwaters, public landings, wharves, docks, markets, parks, recreational facilities, structures, buildings, piers, storage facilities, public buildings and plazas, anchorages, utilities, bridges, tunnels, roads, causeways and any and all property and facilities necessary or useful in connection with the foregoing, and any one or more or any combination thereof and any extension, addition, betterment or improvement of any thereof."

*Bannon v. Port of Palm Beach Dist.*, 246 So. 2d 737, 738 (Fla. 1971).

This broad definition is within the concept of what "port facilities" actually are. In M. Fair, *Port Administration in the United States,* ch. 9 (1954), Port Jurisdiction and Supporting Facilities at 122-24, the author discusses warehouses, and notes that "port authorities often have jurisdiction over the several categories of ancillary facilities. Adequate and efficient warehouse facilities are essential to attract trade to the port. . . . Manipulation and even manufacture of goods to be re-exported are permitted at bonded warehouses. . . . Although warehousing facilities should, in general, be privately operated, public ownership of waterfront facilities is sometimes desirable."

If the use of the term "port facilities" is to describe the type of facility, by analogy, that is allowed to be used for public facilities, the legislature could hardly have chosen a broader term. The ownership of a building by the tribe to

be leased to others to manufacture goods and provide employment for the tribe, is completely consistent with a port's ownership of a warehouse used to manufacture goods by a tenant for reshipment. The economic ripple effect here, providing housing for industry that in turn will stimulate the economy and provide many additional jobs for members of the tribe, is the same as that which occurs in the state at large when a publicly-owned warehouse in a port facility assures increased commercial shipping and its related jobs.

█ The last question to be disposed of is whether the proposed expenditure of public funds is for a "public purpose" under article 7, section 1 (amendment 14), which states: "All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax and shall be levied and collected for public purposes only."

Stimulation of investment and job opportunity for relief of unemployment and poverty are proper public purposes within this constitutional provision. *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P.2d 1 (1933). Where it is debatable as to whether or not an expenditure is for a public purpose, we will defer to the judgment of the legislature. *State ex rel. Reclamation Bd. v. Clausen*, 110 Wash. 525, 541, 188 P. 538, 14 A.L.R. 1133 (1920).

█ We have approved a condemnation of private property to build a public facility for air cargo storage and transfer which would be leased to private industry, recognizing that "[a]s long as the object sought to be accomplished is for a public purpose, it is for the legislature to determine the means to accomplish it." *In re Port of Seattle*, 80 Wn. 2d 392, 396, 495 P.2d 327 (1972). We there recognized that the lease of facilities to private enterprises was incidental to the main public purpose. Such is the case here. The reduction of unemployment and alleviation of economic distress for the Kalispel Indian Community is a proper public purpose and the use of private industry to

assist government in this task is a permissible legislative choice.

The Economic Assistance Authority was acting within its delegated powers under a constitutional act in approving the proposed expenditure of funds and, therefore, the treasurer is ordered to sign the appropriate warrant.

FINLEY, HAMILTON, STAFFORD, and WRIGHT, JJ., concur.

BRACHTENBACH, J., concurs in the result.

HALE, C.J. (dissenting)—Although the court in this case upholds the grant of a comparatively modest sum of public money, it lays down a precedent of enormous portent. Evoking as it does not only major implications of Indian treaty law, the opinion should prompt an inquiry as to whether the grant and loan of money to an incorporated Indian tribe works a denial of the equal protection and special immunities and privileges provisions of the constitutions. The court's decision rests implicitly, I think, on the absurd premise that this nation can make or maintain a treaty with a group of its own citizens and arrogate to one group of citizens rights, powers, privileges and immunities not available to all other citizens. The court's opinion, as I understand it, is founded on the impossible theory that the President, under his constitutional power to make treaties, could endow aliens and their children and their children's children as citizens of the state and the United States with special rights, powers and immunities not shared equally by all citizens of differing ethnic or national origin unto the end of time. No President under the constitution, even with the approval of the Senate, has ever possessed, nor presumed to exercise, such a power. Except for those rights particularly derived from their tenure in reservation lands, American Indian citizens, therefore, have no political, civil and legal rights, powers, privileges and immunities not held in common by and with all other citizens. Even the highest title to land known to the American common law, that of fee simple absolute, confers no extraordinary political, civil

or legal rights upon the owner. Neither feudalism nor serfdom has ever been recognized in this country. No title of nobility—through which special rights, privileges and immunities and corresponding legal disabilities and limitations arising from title to lands are derived—shall be granted. U.S. Const. art. 1, § 9. With the advent of citizenship, the American Indian lost not only his special privileges and immunities, but his legal disabilities and limitations as well. He was, indeed, as a matter of law, set fully free.

Now, by means of a legislative appropriation and grant of state funds, the State seeks to stimulate employment among the Kalispel Indians who live on the Kalispel Reservation. Although one may doubt the effectiveness of this legislation, its beneficent purpose is clear. Unquestionably, something ought to be done by the State to alleviate the distress of unemployment and to rid the body politic of it. Vigorous steps should be taken by government to cure unemployment wherever it is found and among whatever groups. But constitutionally speaking, the courts are obliged to make certain the cure is not worse than the disease and that the constitutions are not mutilated in the process. The economic history of this country for the past 40 years demonstrates that unemployment may be cut without excising any constitutional precepts. Within the framework and authority of both constitutions there has been reserved by the people vast resources of governmental power for legislative and executive action, resources which can and should be utilized both to alleviate present and operate to arrest permanently chronic unemployment.

Although one may readily doubt that the method or means prescribed by the legislation now under examination will accomplish much and may even assume that it may turn out to be wholly ineffectual, that thought is of no judicial moment here because judicial views on the effectiveness of a statute are immaterial to a decision on its validity. The court's views, however, are final as to its

constitutionality, and the statute here I believe to be unconstitutional and invalid.

A statute such as this one authorizing the gift of tax-raised revenues and loans of credit to a federally incorporated tribe of Indians to be expended for capital improvements to tribal real estate is manifestly unconstitutional because it violates the state constitution (Const. art. 8, § 5) which prohibits the State from giving or lending its credit in any manner to or in aid of any individual, association, company or corporation. And it is repugnant to the fourteenth amendment to the United States Constitution because it deprives all citizens of the state, except the Kalispels and other Indian tribes, of their property without due process of law; and because it deprives nearly all citizens of this state, except Indian citizens, of the equal protection of the laws; and because it grants special immunities and privileges to the Kalispels in particular and other Indian tribes in general by giving money to them which is not available on like terms to all other citizens of the state and of the United States, individually and however else they may be organized in groups.

The three undeniable and overriding facts that make this statute unconstitutional are that (1) the members of the Kalispel Indian community are citizens of the United States and of the state of Washington; (2) membership in the Kalispel community derives exclusively from race and heredity; and (3) except for the District of Columbia and areas held as territories pending admission to the Union (U.S. Const. art. 1, § 8), the federal government is without power to create or maintain federal muncipal governments within the several states. In this latter connection, although the United States may assert exclusive supervision over and control operation of its forts, arsenals, dockyards, post offices, other buildings, national parks and the like (U.S. Const. art. 1, § 8 and U.S. Const. art. 4, § 3), it obviously cannot constitutionally accord the inhabitants thereof a special citizenship nor deprive them of their benefits of

state citizenship, for the constitution sets aside only the District of Columbia to be governed exclusively by the national government. U.S. Const. art. 1, § 8. There is no way whatever under the constitution, without the consent of the states in which they are located, that Indian reservations could be admitted to the Union as sovereign states, for it is ordained that no new state shall be formed or erected within the jurisdiction of any other state; nor shall any state be formed by the junction of two or more states or parts of states without the consent of the legislatures of the states concerned and of the Congress as well. U.S. Const. art. 4, § 3.

The public whose funds are being expended under this statute includes all citizens of this state; no one, however, except those who are descendants of and have membership in the Kalispels may claim any of the benefits to be derived from this grant of public money and credit. All others, except the Kalispels, are categorically excluded from membership in the Kalispel incorporated tribe, and there exists no alternative way in which the public may become eligible to enter upon, enjoy the use of, or occupy Kalispel Reservation lands or to participate in reservation business or affairs or to share in any of the benefits deriving from this loan or grant. For a member of the public—one whose taxes are being appropriated and spent on the Kalispel Reservation —to enter upon the Kalispel Reservation without invitation would constitute a trespass, and if one should try to participate in any tribal council engaged in spending the corporate tribal funds or regulating the use of reservation lands, his action would amount to an attempted unlawful usurpation. In assessing the legal character of the Kalispel Reservation and tribal business, there is scarcely anything in the body politic, aside from prisons and military installations, which is so removed from public use as an Indian reservation, and state and national citizenship are not tickets to entry. Whatever tenure the Kalispels may have in reservation lands, one may be sure that it includes one of the

attributes of a fee simple absolute to prohibit trespass by nontribal members.

Critical to this case is the status of treaty Indians as citizens of the United States and of the state of Washington. The first *general* act to confer citizenship upon all Indians was enacted June 2, 1924, as follows:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all noncitizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States: *Provided,* That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian *to tribal or other property.*

(Last italics mine.) Act of June 2, 1924, ch. 233, 43 Stat. 253. One should note that the rights protected by the proviso are the rights *to tribal or other property,* and do not purport to do the constitutionally impossible of reserving or conferring special political rights, privileges or immunities.

The Kalispels thus, as American citizens and citizens of the state of Washington, except for a tenure in individual and reservation lands, possess all rights, privileges and immunities held in common by all citizens of the state and the United States and those rights, privileges and immunities which necessarily derive from their tenure in land. They have a right to sue and are subject to being sued in the courts of this state and of the United States; they may vote in all elections and hold public office; they may sit on juries in state and federal courts and are entitled to trial by jury to the same extent as are all other citizens. They are entitled to all of the educational benefits available to all other citizens of their state and district, including attendance at public high schools, vocational schools, colleges and universities. They are liable to be drafted into the armed forces, but are entitled to all of the emoluments of honorable service, including educational, medical and pension benefits. Indian citizens may travel freely throughout the length and breadth of the land and have all passport and

reentry privileges that go with national citizenship. They may not be deported. And they cannot be sequestered nor confined except by due process of law, and only then to the same extent and for the same reasons as are all other citizens. Their status as citizens, in short, is identical to and coextensive with all citizens of this state and of the United States. If in some future day the Congress should find it necessary to curtail some of the benefits now accorded aliens who live and work in this country, such as social security, medicare, unemployment compensation and the like, it is unthinkable that such limitations could be made to apply to American Indian citizens. But whatever other rights, privileges and immunities Indian citizens may enjoy, they arise only from and do not extend beyond those which are incident to their ownership and tenure in land.

Neither the State of Washington, which now seeks to do so, nor the United States, can lawfully confer special benefits or place special burdens upon any class of citizens which do not apply equally to all citizens of the same state and district, for equality before and within the law is the very essence of national and state citizenship. Any doctrine according preferred status to a particular group of citizens is on its face inimical to the very essence of constitutional government, abrogates the concepts of national and state sovereignty created by the constitution, and is destructive of the ideas of self-government. The grant of special privileges and immunities to one group of citizens on its face is repugnant to the precepts of the constitutions that all citizens are entitled to the equal protection and application of the laws and none may in law be afforded special privileges or immunities.

The case comes here on stipulated facts acknowledging that "The Kalispel Indian Community is an Indian tribe recognized as such by the federal government." As a tribe, it is incorporated under 25 U.S.C. § 476 (1934). In 1972, the legislature enacted Laws of 1972, 1st Ex. Sess., ch. 117, p. 278 (RCW 43.31A). Construction grants or loans under this

statute may be made by the economic assistance authority "to political subdivisions of the state and Indian tribes recognized as such by the federal government, for the purpose of assisting such organizations in financing *the cost of public facilities . . . and improvements for public facilities . . .*" (Italics mine.) RCW 43.31A.070.

As an Indian tribe, the Kalispel Indian community applied here for a $300,064 grant under the Economic Assistance Act of 1972 for construction of an 80- by 240-foot metal building; the expenditures would include $16,000 for site preparation, $23,400 for water, $25,800 for sewer, and $202,940 for construction of the building, plus a 10 percent contingency fee of $26,824 and an inspection fee of $5,000. In its application, the tribe asserted that the building would enable the "Kalispel Tribe of Indians to house manufacturing firms, and in turn will create permanent employment for members of the Tribe and residents of Central Pend Oreille County." The tribe asserted in its application that the project would initially create 18 jobs and at peak employment another 12 for a total of 30 jobs and that the building would be located on the Kalispel Reservation and become a part of a planned industrial park "contemplated and needed by the Tribe on its industrial site near Cusick, Washington." Presumably the tribe will thereafter lease space in the building to private ownership and collect the rents from it.

In no sense can the Kalispel tribe be said to constitute a political subdivision of the State of Washington nor anything other than a federally chartered corporation, membership in which is based exclusively on race, heredity and ethnic origin—except perhaps when, with the consent of the tribe, membership in it may be achieved by marriage or adoption. 25 U.S.C. §§ 476, 477 (1934). The facilities to be built on the Kalispel Reservation with the funds provided by the State of Washington can, therefore, in no sense be said to be public facilities. The building will be the very essence of private corporate ownership of the most private

character, for persons not of the Kalispel tribe cannot purchase stock or shares in the enterprise and, because of their want of Kalispel ancestry, cannot uninvited even enter upon the financed premises. Nor does this court's acceptance of what I perceive to be no more than descriptive dicta in *State v. Bertrand,* 61 Wn.2d 333, 339, 378 P.2d 427 (1963), attributing a sovereignty to Indian tribes, aid the court's thesis here, for it stands to reason the State can no more give its citizens' money to a foreign sovereignty than it can to a private individual or corporation.

It is thus a legal impossibility to leap the barrier now existing between the incorporated tribal entity, whether political or corporate, and the State of Washington, whose juridical existence rests exclusively on the Constitution of the United States and the Constitution of the State of Washington. Between the tribe and the State lie these indomitable barriers—the nationhood of the United States and the statehood of the state. And the constitutions do not allow the creation or establishment of autonomous political tribes existing independently of either sovereign. It would be as unconstitutional for the President to grant Indians superior powers of citizenship by treaty as it would be to attempt to admit a foreign country to the Union solely by treaty. Congress alone has the power to admit new states and even this power is sharply curtailed when it comes to admitting territories from parts of other states, or from the junction of two or more states or parts of states. In the latter instances, the legislatures of the concerned states have the final say. U.S. Const. art. 4, § 3.

The so-called attribute of sovereignty, upon which ephemeral notion so much Indian treaty law depends, whether stated or implied—if found to exist in any degree and which the court, I think, erroneously finds in incorporated Indian tribes—does not and cannot in my view juridically exist. To the extent of its claimed existence, it denies state sovereignty and national sovereignty. Except for their ownership of land, and the powers to occupy it and man-

age, control and dispose of the resources found on and under it, treaty tribes cannot under either constitution possess and, therefore, do not have, any rights, privileges or immunities not held in common by all citizens of the United States and of the state in which their reservation is situated. Whatever special rights Indian citizens may have, or claim to have, arising from tribal treaties to be asserted or exercised upon lands, waters and in the air above outside the boundaries of their reservations, necessarily evaporated with the advent of their citizenship.

The view that an incorporated Indian tribe possesses any attributes of sovereignty whatever and that its members are citizens of the nation, the state, and have a kind of tribal citizenship too, is therefore, a manifest absurdity for its rests on the ludicrous premise that an exclusive group having a preordained and common bloodline and of a predetermined race may possess powers of government and have special rights in state and national resources not available to all other national, state and local governmental entities. It is an erroneous premise necessarily acknowledging that a political entity or subdivision dependent for its existence solely on race and ancestry may, under the constitution, possess some degree of sovereignty independent of the state and the nation.

The very claim of tribal exclusiveness and separateness operates to remove the political entity, in this instance the Kalispel tribe, even farther from being a public entity because it enhances the claimed exclusive character of the Kalispels and, to the extent that they are exclusive and separate, they are nonpublic. An Indian tribe, whether federally incorporated or otherwise, must, therefore, be deemed private, and from the very nature of things cannot be privately sovereign, too. The State can no more lawfully give its money or lend its credit to this particular corporation than it could do so to any other private corporation. Accordingly, the idea that a species of sovereignty reposes in Indian tribes whose membership is based exclusively on

race and heredity operates to enhance rather than reduce the constitutional barrier against the giving or lending of the State's money or credit to any private individual or corporation, for the greater its attributes of sovereignty the more exclusive and private the tribe becomes.

However vague and amorphous the concept may be, the courts are without constitutional power to define "Indian sovereignty" into a status that either abridges or exalts Indian, state and United States citizenship so as to substantially create an inequality one way or the other between citizens of Indian ancestry and citizens of any other ancestry. It thus follows as a general categorical imperative under the constitutions that all law respecting Indian tribes must be interpreted and applied in the light of the grant of citizenship to all Indians born within the United States. *Nationality and Naturalization,* Nationality at Birth and Collective Naturalization, 8 U.S.C. § 1401 (a) (2) (1952).

Because no other citizens of the state or United States can become members of the Kalispel Indian community, nor go upon their lands without their invitation, nor utilize or enjoy in any way the building to be constructed with the money to be granted, nor share in its management or its rents or profits, it follows that the purpose for which the grant and loan is being expended is necessarily private and cannot be construed as public and that the grant and loan directly contravene Const. art. 8, § 5, which specifies that:

> The credit of the state shall not, *in any manner* be given or loaned to, or in aid of, any individual, association, company or corporation.

(Italics mine.)

An Indian tribe is not a public agency. Its membership is more exclusive and nonpublic than probably anything known to our law because it is based exclusively on blood and heredity. The fact that tribes may in extraordinary cases admit one to membership by marriage, adoption or invitation does not alter the singular quality of its exclusiveness.

This court, I think, passed directly upon the question of the grant of state credit to private corporations when it decided in *Highway Comm'n v. Pacific Northwest Bell Tel. Co.*, 59 Wn.2d 216, 224, 367 P.2d 605 (1961), that a statute which provided reimbursement to utility companies for the costs of relocating their lines and facilities, even when this was necessitated by the construction of an interstate freeway, was unconstitutional and void as amounting to a gift of public funds for a nonpublic purpose and therefore prohibited by Const. art. 8, § 5. Despite obvious benefits inuring to the public because of the construction of a public highway which necessitated the relocation of the lines and facilities, the court said:

> The utility companies here in question perform a public service, and are subject to state regulation. The performance of such service does not constitute a state purpose for the reason that the facilities are owned and operated by entities other than the sovereign state of Washington. *State Highway Comm. v. Southern Union Gas Co.*, 65 N. M. 84, 332 P. (2d) 1007, 75 A. L. R. (2d) 408 (1958); *Cincinnati v. Harth*, 101 Ohio St. 344, 128 N. E. 263, 13 A. L. R. 308 (1920). The general fund of the state cannot be constitutionally appropriated by the legislature to pay the operating cost of a separate entity, simply because it is engaged in performing a public service. Art. 8, § 5, of the constitution, prohibits the legislature from appropriating public funds to pay the respondents' expenditures here in question.

If a public utility corporation operating under state franchise and certificate and under intensive state regulation, having the power of eminent domain in particular instances and under both common law and statutory duty to provide its service to all members of the public within its district without regard to race, religion, color, creed or economic status, cannot be the recipient of a grant or credit, the same rule must apply to an Indian tribe which has no public aspects to it whatever. Non-Indians, whether residents of the area in which the reservation is located or residing elsewhere, or Indians of other tribes, while clearly within

their rights to demand the service of any public utility serving their district have no rights to any services, employment or land use which the tribe may elect to supply. Quite the contrary, where, in using a public way, one may lawfully walk near or under, or above the transmission lines of a privately owned public utility, he would be held a trespasser if, without invitation, he goes upon reservation lands.

This court, in applying Const. art. 8, § 7, which is similar to Const. art. 8, § 5, and prohibits counties, cities, and other municipal corporations from lending their money or credit to private individuals or corporations, has steadfastly adhered to the requirement that, unless the benefits of the money or credit are available to genuinely public agencies, the grants or loans are unconstitutional. Thus, early in the history of this section, a city or county could lend money or credit to school districts (*Maxon v. School Dist. 34*, 5 Wash. 142, 31 P. 462, 32 P. 110 (1892); *State ex rel. School Dist. 24 v. Grimes*, 7 Wash. 270, 34 P. 836 (1893)); and a diking district, too, was held to be a public body. *Foster v. Commissioners of Cowlitz County*, 100 Wash. 502, 171 P. 539 (1918); *Kadow v. Paul*, 134 Wash. 539, 236 P. 90, *aff'd*, 274 U.S. 175, 71 L. Ed. 982, 47 S. Ct. 561 (1925). But it is scarcely arguable that school districts, diking and drainage districts, and port districts (*Paine v. Port of Seattle*, 70 Wash. 294, 126 P. 628, 127 P. 580 (1912)), and the like are public organizations and in no sense can be said to be private. The same applies to public utility districts. *Roehl v. PUD 1*, 43 Wn.2d 214, 261 P.2d 92 (1953). Thus, this court held explicitly that, even though a port district was a wholly public entity, it could not, under the constitution, expend its funds in providing food and drink for promotional hosting. To do so, we said, constituted the making of gifts of money in violation of the constitution even though the food and drink were given for an otherwise legitimate purpose. *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 399 P.2d 623 (1965).

In *State ex rel. Potter v. King County,* 45 Wash. 519, 88 P. 935 (1907), in an opinion by Rudkin, J., this court held invalid negotiable bonds issued by an overwhelming vote of the people of King County, the bonds being for the purpose of providing public funds in aid of the United States government for the acquisition of lands upon which to build the Lake Washington ship canal, with the funds upon completion ultimately to go to the contractor to apply toward his contract. Although a ship canal is undeniably a public improvement, available for use without discrimination to members of the public under federal regulation, the bonds were held violative of Const. art. 8, § 7, as amounting to a loan of money or credit to the constructing contractor. Along that line this court held that subsidies paid by the county to a privately owned corporation engaged in operating ferries carrying people and vehicles between public highways was a gift to a private corporation even though the public had the right to use the ferries upon payment of the fares. *State ex rel. Washington Nav. Co. v. Pierce County,* 184 Wash. 414, 51 P.2d 407 (1935). This opinion rested in part upon *Johns v. Wadsworth,* 80 Wash. 352, 141 P. 892 (1914), in which the court held that Const. art. 8, § 7, prohibited the appropriation of public money from the county treasury for the payment of expenses and premiums to be awarded at a county agricultural fair because, although the fair would be open to the public as exhibitors and patrons and visitors, it was owned and operated by a private corporation. *Accord, State ex rel. O'Connell v. PUD 1,* 79 Wn.2d 237, 484 P.2d 393 (1971). Long before the word had been invented, the founders of this State set up constitutional barriers to fascism.

The federal government purports to control the actions of the Indian tribes but its powers to do so since the last of the Indian wars has long since been fought derive solely from the powers of Congress to "regulate commerce . . . with the Indian tribes" (U.S. Const. art. 1, § 8), the powers of the President to make treaties (U.S. Const.

art. 2, § 2) and the supremacy clause. U.S. Const. art. 6. The federal government, except for those areas lying within its constitutional powers cannot exercise the sole powers of government to the exclusion of the state over any areas of any state, for the federal government's exclusive powers to govern an area are limited to the District of Columbia (U.S. Const. art. 1, §.8), and to places purchased by the consent of the legislature of the state in which the same shall be for the erection of "forts, magazines, arsenals, dock yards, and other needful buildings." U.S. Const. art. 1, § 8. The Congress is thus barred from establishing federal municipal corporations, counties or other political subdivisions within the territories of the states without their specific consent.

Parenthetically, it should be pointed out that here we do not have a case testing whether a resident of an Indian reservation, possessing both national and state citizenship and asserting the rights to vote and hold public office in the state and its political subdivisions, must submit to the jurisdiction of tribal courts and legislative councils over his person, family and property. Resolution of that issue must await another day and perhaps a different tribunal.

In admitting a state into the Union, the United States must "guarantee to every state in this union a republican form of government, and shall protect each of them against invasion . . ." U.S. Const. art. 4, § 4. A republican form of government necessarily means that, when it comes to the exercise of political and legal rights, there is but one class of citizens—all citizens exercising the same and equal rights and privileges and sharing the same and equal responsibilities. The Congress is, therefore, without constitutional power, save within the District of Columbia, to grant to one class of citizens of a state any powers or rights not held in common by all citizens of the state. This broad principle of state vis-a-vis national sovereignty was recognized in *Ward v. Race Horse,* 163 U.S. 504, 510, 514, 41 L. Ed. 244, 16 S. Ct. 1076 (1896), holding that, although a treaty with an Indian tribe which gave to the Indians hunt-

ing rights on unoccupied lands of the United States—rights that would cease when the United States parted with title to any of the land—the treaty was deemed repealed with the admission to the Union of the territory in which the hunting land was situated.

Each state is admitted to the Union on an equal status with all other states. *In re Rafferty,* 1 Wash. 382, 25 P. 465 (1890); *Permoli v. First Municipality,* 44 U.S. (3 How.) 589, 609, 11 L. Ed. 739 (1845); *McCabe v. Atchison, T. & S.F. Ry.,* 235 U.S. 151, 59 L. Ed. 169, 35 S. Ct. 69 (1914); *Illinois Central R.R. v. Illinois,* 146 U.S. 387, 36 L. Ed. 1018, 13 S. Ct. 110 (1892). *See* Enabling Act, which declares that with the final act of compliance, the state "shall be deemed admitted by Congress into the Union . . . on an equal footing with the original States . . ." Enabling Act, § 8, 25 Stat., ch. 180, p. 676 (February 22, 1889); RCW Vol. 0. It follows, therefore, that the United States exercises no jurisdiction whatever over any lands or territory within any state not owned or controlled by it. If the federal government cannot constitutionally impair or aggrandize the qualities of state and national citizenship, it cannot do so indirectly. It cannot, for example carve out of any state those lands not owned or otherwise controlled by it and create thereon federal municipal corporations operating to the exclusion of state sovereignty; and if by any stretch of the judicial imagination the constitution were strained to accomplish such an event, under no tenable theory could it constitutionally limit citizenship or membership in it to persons of any particular race, creed, color or ethnic strain or origin.

The constitution, when adopted, recognized that the Indian tribes were not to be regarded as citizens; nor were they to possess any powers of self-government not accorded them by Congress, for in prescribing apportionment of seats in the House of Representatives among the several states the computation of population should exclude "Indians not taxed." U.S. Const. art. 1, § 2. Both the Enabling

Act; section 4, and the state constitution, article 2, section 3, recognize that Indians not taxed retained their aboriginal status and were not to be included among those who were to exercise the powers of citizenship, apparent or real, upon admission of the state into the Union. Accordingly, when by proclamation No. 8 of President Benjamin Harrison, November 11, 1889, 26 Stat. 10, the Territory of Washington was admitted to the Union as the State of Washington, the President certified that the state had complied with the provision of the Enabling Act, that the new state's constitution provided for a republican form of government, and that it would make no distinction in civil or political rights on account of race or color, "except as to Indians not taxed."

The line of demarcation between Indians who had become integrated into the body politic and those who retained a segregated tribal status was preserved intact when Washington came into the Union, for the Congress, while admitting and the President proclaiming this state's admission, necessarily approved article 1, section 12, of the new state's constitution which provides that "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." But the distinction between tribal Indians and citizens was steadfastly maintained in article 2, section 3, of this state's constitution as to "Indians not taxed," a distinction that constitutionally had to end with the advent of universal American and state citizenship for all Indians born within the United States.

Whatever may have been the political status of Indians, however, up to and shortly following the Civil War, whether they were possessed in some degree of a kind of sovereignty, their status began to change abruptly in 1871. At that time, after more than a century of treaty making, the Congress set in motion a chain of legislation obviously designed to end in complete emancipation of the American

Indian and accomplish his integration into the American political society. In the Act of March 3, 1871, ch. 120, § 1, 16 Stat. 566, 25 U.S.C. § 71, the Congress, while preserving existing treaties, declared that from that time forward no Indian tribe could be recognized or acknowledged as an independent nation, tribe or power and that no treaties or treaty obligations could thereafter be made or created with them. This meant that existing tribes were subject to direct legislation of the Congress (*Matter of Heff*, 197 U.S. 488, 49 L. Ed. 848, 25 S. Ct. 506 (1905)) even to the extent of controlling their funds and property. *Leighton v. United States*, 29 Ct. Cl. 288 (1894), *aff'd*, 161 U.S. 291, 40 L. Ed. 703, 16 S. Ct. 495 (1896). The Congress did, however, pursue a policy of regulating commerce in Indian reservations allowing no one except tribal Indians to engage in trade upon the reservations except through a license issued by the Commissioner of Indian Affairs and his successor officials. Act of July 31, 1882, ch. 360, 22 Stat. 179, 25 U.S.C. § 264. Looking toward eventual emancipation, Congress then enacted allotment statutes, setting aside to reservation Indians separate parcels of reservation land for agricultural and grazing and irrigation purposes to be utilized and possessed by the Indian much as land held in fee simple except for strictures upon the power of alienation to nontribal members. Act of February 8, 1887, ch. 119, § 1, 24 Stat. 388, 25 U.S.C. §§ 331-34. And, in 1901, the states were authorized to condemn allotted lands for public purposes as though the land had been held in fee, with money damages to be paid directly to the allottee. Act of March 3, 1901, ch. 832, § 3, 31 Stat. 1084, 25 U.S.C. § 357.

Then came the major piece of legislation rendering, I think, most Indian law and judicial analysis obsolescent and removing from the Indians those aspects of both serfdom and feudalism in which the laws of the United States had theretofore held them. In June 1918, for example, the Congress provided that full-blooded members of the Five Civilized Tribes could sell their allotments and that parti-

tion could be made under the laws of the State of Oklahoma with the express provision that "the conveyance thereunder shall operate to relieve the land described of all restrictions of every character." Act of June 14, 1918, ch. 101, § 2, 40 Stat. 606, 25 U.S.C. § 355. In between, of course, there has been a mass of legislation affecting Indians—the tenor of which has been to gradually eliminate the Indian reservation and tribal status, and to look toward total emancipation and integration, including a conferring of United States citizenship in particular cases.

Finally, despite a plethora of judicial holdings to the contrary, the grant of citizenship in 1924 made all Indians equal to all other citizens, sharing, however, both rights and duties of citizenship but preserving, of course, to them their property rights in their allotted and tribal lands. Prior to 1924, an Indian apparently did not acquire United States or state citizenship by merely separating from the tribe and taking up residence among white citizens even though he had been born in this country. *Elk v. Wilkins*, 112 U.S. 94, 28 L. Ed. 643, 5 S. Ct. 41 (1884).

In 1924, however, with the enactment of the general nationality and citizenship act, since substantially reenacted and expanded several times, the Congress categorically, without reservation or qualification, conferred United States citizenship upon all Indians born in the United States, in the following language of 8 U.S.C. § 1401 (a):

(a) The following shall be nationals and citizens of the United States at birth:
(1) a person born in the United States, and subject to the jurisdiction thereof;
(2) a person born in the United States to a member of an *Indian*, Eskimo, Aleutian, or other *aboriginal* tribe. *Provided*, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;
. . .

(Italics mine.) The Fourteenth Amendment, of course,

makes all Indian citizens citizens of the state in which they reside.

It is quite clear, therefore, that the Congress did not intend to confer citizenship upon aborigines, but upon their descendants; that Congress had concluded that all Indians then living could no longer be deemed aborigines.

Since the enactment of that statute, a body of law has developed which seems to imply either that Indians are not citizens of the United States and of the state in which they reside; that they occupy some kind of nether existence between serfdom and feudal villeinship; that because title in fee to reservation lands remain in the United States—although in trust for the Indians severally and collectively—these restrictions operate to curtail their political rights in some respects and enhance them above those of their fellow citizens in others. Thus, decisional law holding that the grant of citizenship is not inconsistent with a continuing wardship (*See Board of County Comm'rs v. Seber*, 318 U.S. 705, 87 L. Ed. 1094, 63 S. Ct. 920 (1943)), must be deemed error as perpetuating an invidious discrimination. And a holding that Indian lands are under continuous guardianship of the government by virtue of the power of Congress to legislate over Indian lands (*United States v. Candelaria*, 271 U.S. 432, 70 L. Ed. 1023, 46 S. Ct. 561 (1926)), if construed to go beyond preservation of property rights in lands held in trust by the government, will amount to a decision that Indians are not full and unqualified citizens of the United States and of the states but occupy a kind of subordinate or second-class citizenship.

I would, therefore, hold the statute before us unconstitutional when applied to federally incorporated Indian tribes.

ROSELLINI and HUNTER, JJ., concur with HALE, C.J.